### In re ACUSHNET RIVER & NEW BEDFORD HARBOR PROCEEDINGS RE ALLEGED PCB POLLUTION.

Civ. A. No. 83–3882–Y.

United States District Court, D. Massachusetts.

March 28, 1989.

---

Ellen M. Mahan, William D. Brighton, Environmental Enforcement Section, Land and Natural Resources Div., Washington, D.C., and Martha Sosman, Chief, Civ. Div., U.S. Attys. Office, Boston, Mass., for U.S.

Lee Breckenridge, Chief, and Nancy Preis, Asst. Attys. Gen., Environmental Protection Div., Dept. of the Atty. Gen., Boston, Mass., for the Com. of Mass.

Charles C. Bering, Office of Regional Counsel, U.S. EPA—Region I, Boston, Mass., and Alice Crowe, OECM–Waste, LE 134S, Washington, D.C., for U.S. EPA.

Hugh Schratwieser, Office of Gen. Counsel, Washington, D.C., for Nat. Oceanic and Atmospheric Admin.

Daniel J. Gleason, Mary K. Ryan and Brian T. Kenner, Nutter, McClennan & Fish, Boston, Mass., for AVX Corp.

Paul B. Galvani and Roscoe Trimmier, Jr., Ropes & Gray, Boston, Mass., for Aerovox, Inc.

David A. McLaughlin, Michael J. McGlone, McLaughlin & Folan, New Bedford, Mass., for Belleville Industries, Inc.

Verne Vance, Jr. and Richard W. Benka, Foley, Hoag & Eliot, Boston, Mass., for Cornell Dubilier Electronics Co., Inc.

John R. Quarles and Howard T. Weir, Morgan, Lewis & Bockius, Washington, D.C., for Federal Pacific Elec. Co.

Robert J. Muldoon, Jr., Daniel B. Winslow and Barbara O'Donnell, Sherin & Lodgen, Boston, Mass., for Aerovox, Inc. (Ins. Litigation).

William M. Savino and Gary D. Centola, Rivkin, Radler, Dunne & Bayh, Uniondale, N.Y., Cynthia J. Cohen and Michael B. Bogdanow, Meehan, Boyle & Cohen, Boston, Mass., for Firemen's Fund Ins. Co.

James L. Ackerman, Day, Berry, Howard, Boston, Mass., and Thomas J. Groark, Jr., Day, Berry & Howard, Hartford, Conn., for Aetna Cas. and Sur. Co.

John P. Ryan, Sloan & Walsh, Boston, Mass., for Hartford Ins. Co.

Michael S. Greco and Lisa D. Campolo, Hill & Barlow, Boston, Mass., and Timothy C. Russell and T. Andrew Culbert, Drinker, Biddle & Reath, Washington, D.C., for Lumbermen's Mut. Cas. Co. and American Motorists Ins.

Stephen J. Paris and Michael F. Aylward, Morrison, Mahoney & Miller, Boston,

Mass., for CNA Ins. Co. and Reliance Ins. Co.

Roger E. Warin, Stephen A. Fennell and Anita G. Raby, Steptoe & Johnson, Washington, D.C., for Highlands Ins. Co.

Wm. Gerald McElroy, Jr. and John T. Harding, Jr., Zelle & Larson, Waltham, Mass., for Employers Ins. of Wausau.

James P. Whitters, III, Gaston & Snow, Boston, Mass., for Liberty Mut. Ins. Co.

Bert J. Capone and Deborah S. Griffin, Peabody & Arnold, Boston, Mass., for Home Ins. Co. and Lexington Ins. Group.

Robert F. Corliss and Robert A. Romero, Jr., Corliss & Romero, Boston, Mass., and Mary Ann D'Amato and Paul Moran, Mendes & Mount, New York City, for Underwriters at Lloyd's.

Pamela C. Slater and Allan E. Taylor, Taylor, Anderson & Travers, Boston, Mass., for First State Ins. Co.

Timothy P. Wickstrom, Tashjian, Simsarian & Wickstrom, Worcester, Mass., for Mission Ins. Co.

Calum B. Anderson, Parker, Coulter, Daley & White, Boston, Mass., for Northbrook Excess & Surplus Ins. Co.

Carl K. King and Gayle M. Merling, Goldstein & Manello, Boston, Mass., for EPEC, Inc.

David P. Rosenblatt, Burns & Levinson, Boston, Mass., for Plating Technologies.

Erik D. Olson, Counsel, Nat. Wildlife Federation, Washington D.C., for Nat. Wildlife Federation.

## MEMORANDUM ON SUCCESSOR LIABILITY

YOUNG, District Judge.

In late 1972, Belleville Industries, Inc. ("Belleville") entered into an agreement with Aerovox Corporation ("Aerovox Corp."). Under the terms of the agreement Belleville acquired substantially all of the assets of Aerovox Corp.'s Electrical Products Division, including the physical plant and the underlying real estate located along the Acushnet River in New Bedford, Massachusetts (the "plant site"). Belleville also acquired the right to use the name "Aerovox." After the sale, Belleville changed its name to Aerovox Industries, Inc. ("Aerovox Industries"), and Aerovox Corp. merged into AVX Ceramics Corporation ("AVX"). For purposes of simplicity, both Belleville and Aerovox Industries will be referred to throughout this opinion simply as "Belleville," unless the context requires otherwise.

Aerovox, Incorporated ("Aerovox") was formed in 1978, and is a wholly owned subsidiary of RTE Corporation ("RTE"). The history of its founding begins in September, 1978 when it was organized under the laws of Massachusetts. In that same month, RTE, Aerovox, and Belleville entered into an "Agreement and Plan of Reorganization" (sometimes the "1978 agreement"). Although the terms of the agreement were somewhat complex, the deal itself was a rather straight-forward stock-for-assets transaction. Under the agreement Aerovox acquired all of Belleville's assets, property, and rights of any kind, including rights to the name "Aerovox." Aerovox agreed to assume all of Belleville's balance sheet liabilities and to perform all of its contracts, with one exception: Aerovox specifically disclaimed any liability arising out of Belleville's use or disposal of polychlorinated biphenyls ("PCBs"). In return, Belleville received one share of RTE stock for each share of Belleville stock outstanding, less 55,000 RTE shares which were placed in escrow.[1] The agreement required Belleville to liquidate and dissolve promptly after the transfer of assets, and to distribute the RTE shares to its shareholders on a pro rata basis. The deal between Aerovox, RTE, and Belleville was consumated on October 27, 1978. Since that day, Aerovox has continued to manufacture electronic products at the plant site.

---

1. The purpose of the escrow account was to provide a fund out of which to reimburse RTE and Aerovox for monies they might pay out as a result of Belleville's liabilities which they assumed.

In December, 1983, the United States and the Commonwealth of Massachusetts (hereinafter referred to as the United States or the sovereigns) filed these now consolidated suits. The complaints allege, *inter alia*, that AVX, Belleville, Aerovox, and RTE [2] are liable under state and federal laws for contamination of the Acushnet River and New Bedford Harbor resulting from the use and disposal of PCBs at the plant site. Pursuant to the previous orders of the Court, the sovereigns' claims against Aerovox for natural resource damages under sec. 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. sec. 9607, are scheduled to be tried to a jury.[3] The United States and Aerovox filed cross motions for summary judgment on the question of successor liability. These cross-motions present the question whether, in view of the nature of the sovereigns' claims, Aerovox is liable as Belleville's corporate successor as matter of law. The Court has ruled that Aerovox is so liable, at least insofar as the assets of Bellevile are insufficient to satisfy any judgment the sovereigns may obtain against Belleville. This memorandum explains the Court's reasoning.

 The first issue before the Court is whether the common law doctrine of successor liability has any place in the federal jurisprudence that Congress intends the courts to develop in interpreting CERCLA. *See, e.g., Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 91 (3d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989); *United States v. Bliss*, 667 F.Supp. 1298, 1308 n. 8 (E.D.Mo.1987); *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 808 (S.D. Ohio 1983). This Court follows the Third Circuit's compelling resolution of this issue in *Smith Land.* There, the court confronted the question whether the defendants, successors of an entity that had dumped asbestos on a parcel of land, was liable in

contribution to the parcel's present owners who had cleaned up the land to the Environmental Protection Agency's satisfaction at considerable cost. The court found it appropriate to impose successor liability. *See also Chem. Waste Management, Inc. v. Armstrong World Indus., Inc.*, 669 F.Supp. 1285, 1295 (E.D.Pa.1987); *cf. Oner II, Inc. v. United States Environmental Protection Agency*, 597 F.2d 184, 186 (9th Cir.1979) (holding that the successor liability theory is applicable under the Federal Insecticide, Fungicide and Rodenticide Act). Its well-reasoned opinion is worth quoting at length:

> The concerns that have led to a corporation's common law liability of a corporation [sic] for the torts of its predecessor are equally applicable to the assessment of responsibility for clean-up costs under CERCLA. The Act views response liability as a remedial, rather than a punitive, measure whose primary aim is to correct the hazardous condition. Just as there is liability for ordinary torts or contractual claims, the obligation to take necessary steps to protect the public should be imposed on a successor corporation.

> The costs associated with clean-up must be absorbed somewhere. Congress has emphasized funding by responsible parties, but if they cannot be ascertained or cannot pay the sums necessary, federal monies may be used.

> Expenses can be borne by two sources: the entities which had a specific role in the production or continuation of the hazardous condition, or the taxpayers through federal funds. CERCLA leaves no doubt that Congress intended the burden to fall on the latter only when the responsible parties lacked the wherewithal to meet their obligations.

> Congressional intent supports the conclusion that, when choosing between the taxpayers or a successor corporation, the successor should bear the cost. Benefits

---

**2.** RTE was later dismissed for want of *in personam* jurisdiction. *See In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution*, 675 F.Supp. 22, 35 (D.Mass.1987).

**3.** *See Acushnet River and New Bedford Harbor: Proceedings Re Alleged PCB Pollution*, 712 F.Supp. 994 (D.Mass.1989).

from use of the pollutant as well as savings resulting from the failure to use non-hazardous disposal methods inured to the original corporation, its successors, and their respective stockholders and accrued only indirectly, if at all, to the general public. We believe it in line with the thrust of the legislation to permit—if not require—successor liability under traditional concepts.

*Smith Land*, 851 F.2d at 91–92.

Moreover, this Court observes that a ruling that the successor liability doctrine has no viability in the CERCLA context would be an invitation to corporations, both polluters and their acquirors, to avoid liability for past pollution through formalistic corporate slight of hand. A paper transaction should not furnish a shield suitable to deflect CERCLA liability for environmental transgressions preceding the transaction. Yet, in the absence of successor liability, the government may find itself without any practical recourse against polluters where, as here, the predecessor corporation is long disbanded, its assets long disbursed, and its shareholders difficult if not impossible to locate should they be held personally liable in any way. Congress could not have intended such a result.

*Smith Land* also holds that, in resolving successor liability issues, the district court should adopt as a uniform federal rule and apply the general doctrine of successor liability in operation in most of the states.[4] *Id.* at 92. That doctrine teaches that a company which purchases the assets of another company does not assume the latter's debts and liabilities. *E.g., Arnold Graphics Indus., Inc. v. Independent Agent Center, Inc.*, 775 F.2d 38, 42 (2d Cir.1985) (applying New York law); *Dayton v. Peck, Stow and Wilcox Co.*, 739 F.2d 690, 692 (1st Cir.1984) (applying Massachusetts law); *Tucker v. Paxson Machine Co.*, 645

F.2d 620, 622 (8th Cir.1981) (citing Missouri law); *Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145, 1152 (1st Cir.1974) (applying New Hampshire law); *Menacho v. Adamson United Co.*, 420 F.Supp. 128, 133 (D.N.J. 1976) (applying New Jersey law); *see also Bouley v. American Cyanamid Co.*, No. 85–4368–Z, 1987 WL 18738 at 7 (D.Mass. Oct. 21, 1987) (discussing the general common law rule).

There are four well-recognized exceptions to the general rule of nonliability for the transfer of a company's assets:

> (1) when the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability; (2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations; (3) when the purchaser corporation is merely a continuation of the seller corporation; or (4) when the transaction is entered into fraudulently to escape liability.[5]

*Dayton*, 739 F.2d at 692; *see Schmoll v. A C and S, Inc.*, 703 F.Supp. 868 (D.Or.1988) (Panner, C.J.) (holding that successor liability is applicable where a complex assets transaction was undertaken to escape asbestos injury liability even in the absence of fraud); *see also Cyr*, 501 F.2d at 1152 (adding a fifth exception—when a purchaser is not acting in good faith—not relevant here); *Lumbard v. Maglia, Inc.*, 621 F.Supp. 1529, 1535 (S.D.N.Y.1985); 15 Fletcher, *Cyclopedia of the Law of Private Corporations*, sec. 7122 at 189 n. 1 (perm ed. 1983). Here there is no suggestion of an express or implied agreement, nor of fraud. Accordingly, the United States focuses on the second and third exceptions. In particular, the United States argues that the transaction between Aerovox and Belleville was a merger in everything but name. With appropriate references to Shake-

---

**4.** The court feared that if courts employed state law, "CERCLA aims [might] be evaded easily by a responsible party's choice to arrange a merger or consolidation under the laws of particular states which unduly restrict successor liability." 851 F.2d at 92.

**5.** This Court notes that some courts have recognized a "product line" exception in products liability cases. *See, e.g., Ray v. Alad Corp.*, 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977). The First Circuit has refused to hold that the doctrine has vitality under Massachusetts law. *See Dayton*, 739 F.2d at 694.

speare,[6] it thus concludes that, as with a *de jure* merger, Aerovox should be held to have assumed Belleville's liabilities as matter of law.

█ When a *de facto* merger is alleged, the court must determine "the substance of the agreement [regardless of] the title put on it by the parties." *Cinocca v. Baxter Laboratories, Inc.,* 400 F.Supp. 527, 530 (E.D.Okla.1975); *see also Philadelphia Elec. Co. v. Hercules, Inc.,* 762 F.2d 303, 310–11 (3d Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985). If the parties have not observed the statutory requirements for a *de jure* merger, but have nonetheless achieved virtually all the results of a merger, a court may hold the surviving corporation liable for the conduct of the transferor corporation as if the merger were *de jure. See, e.g.,* 15 Fletcher, *supra,* sec. 7165.5, at 339. Courts consider the following factors in determining whether to characterize a purported sale of assets as a *de facto* merger, all of which favor the finding of such a merger:

(1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Hercules,* 762 F.2d at 310; *see also Arnold Graphics,* 775 F.2d at 42; *Keller v. Clark Equip. Co.,* 715 F.2d 1280, 1291 (8th Cir. 1983), *cert. denied,* 464 U.S. 1044, 104 S.Ct. 713, 79 L.Ed.2d 176 (1984); *Lumbard,* 621 F.Supp. at 1535; *Korzetz v. Amsted Indus., Inc.,* 472 F.Supp. 136, 143 (E.D.Mich. 1979); *Ladjevardian v. Laidlaw–Coggeshall, Inc.,* 431 F.Supp. 834, 839 (S.D.N.Y. 1977); *Menacho,* 420 F.Supp. at 133; *Shannon v. Samuel Langston Co.,* 379 F.Supp. 797, 801 (W.D.Mich.1974); 15 Fletcher, *supra,* sec. 7165.5, at 339–40.

No one of these factors is either necessary or sufficient to establish a *de facto* merger. *Bud Antle, Inc. v. Eastern Foods, Inc.,* 758 F.2d 1451, 1457–58 (11th Cir.1985); *Atlas Tool Co., Inc. v. Commissioner of Internal Revenue,* 614 F.2d 860, 870 (3d Cir.), *cert. denied,* 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980); *Menacho,* 420 F.Supp. at 133; *Lumbard,* 621 F.Supp. at 1535. Unlike other theories of successor liability that may have only limited applicability,[7] the *de facto* merger doctrine is a judge-made rule that rests on general equitable principles, and exists "independent of any particular cause of action." *Hercules,* 762 F.2d at 312; *see also In re Penn Central Securities Litigation,* 367 F.Supp. 1158, 1170 (E.D.Pa.1973) ("The *de facto* merger doctrine is a judge made device for avoiding patent injustice").

█ It is beyond dispute that continuity of enterprise is present. Since the closing, Aerovox has continued to manufacture Belleville's product lines of electric capacitors and related products [8] at the plant site,

**6.** "What's in a name? That which we call a Rose/ By any other name would smell as sweet." W. Shakespeare, *Romeo and Juliet,* Act II, Sc. 2, Line 42–43.

**7.** For example, the product line theory. *See supra* note 5.

**8.** Aerovox relies heavily on the fact that the capacitors it manufactured, unlike those manufactured by Belleville, were not PCB-impregnated. This technological innovation is relevant to

the inquiry, but not dispositive. There is no evidence or suggestion that this change fundamentally altered the quality or capability of the capacitors or the marketplace's perceptions of the product. Under these circumstances, the products manufactured by Aerovox were not sufficiently different from Belleville's products to preclude a finding of continuity of enterprise. Aerovox also asserts that it discontinued some products manufactured by Belleville and added new ones. Supplemental Affidavit of Clifford

and the products continued to be sold under the "Aerovox" name.[9] The president, the vice-president, and the treasurer of Belleville all assumed those same positions at Aerovox. These three Belleville officers also became Aerovox directors.[10] The middle management of Belleville became, in most respects, the middle management of Aerovox. The employees of the two corporations were essentially the same.[11] The same physical facilities were utilized. Tuttle Aff. at para. 5. Aerovox also used the same banking facilities and the same insurance company as had Belleville. For all the world could tell from outward appearance, Aerovox Industries had simply shortened its name.

Likewise, Aerovox clearly assumed all those obligations of Belleville necessary for it to continue Belleville's normal business operations uninterrupted. Under the terms of the 1978 agreement, Aerovox assumed all Belleville's balance sheet liabilities and agreed to perform all its written contracts. The only liability specifically excluded was liability arising from Belleville's use and disposal of PCBs.

For the most part, Aerovox does not dispute the existence of these factors. Instead, Aerovox argues that the *de facto* merger doctrine is inapplicable to the facts of this case because there was no continuity of shareholders and because Belleville's corporate existence has been revived for purposes of defending this suit. This Court disagrees.

Continuity of shareholders is "[o]ne of the key requirements" of the *de facto* merger doctrine. *Dayton*, 739 F.2d at 693. Aerovox argues that because Belleville received shares of Aerovox's parent corporation, RTE, the requisite continuity is missing. In Aerovox's view, a corporation that desires to purchase the assets of another company with shares of stock can avoid the risk of liability under the *de facto* merger doctrine by forming a wholly-owned subsidiary to act as purchaser. The logic of the rule and the language of the cases do not compel such a holding, and the Court declines to so rule here.

It is true that some courts have used language which suggests that continuity of shareholders requires "the purchaser corporation [to exchange] its own stock as consideration for the seller corporation's assets so that the shareholders of the seller corporation become a constituent part of the purchaser corporation." *Id.; Hercules*, 762 F.2d at 310–11; *but see Arnold Graphics*, 775 F.2d at 42 (requiring that there be "a continuity of stockholders, accomplished by paying for the acquired corporation with *shares of stock*") (quoting *Ladjevardian*, 431 F.Supp. at 839) (emphasis added). In those cases, however, the courts were not actually faced with a purchase achieved through the use of a parent corporation's shares, and to that extent the statements are inapposite. Where courts have confronted purchases made with a parent corporation's stock, that structuring of the transaction did not prevent application of

---

H. Tuttle, Jr. ("Supp. Tuttle Aff.") at para. 8. Accepting these assertions as true, the fact remains that, as Tuttle admits, Belleville's "primary business ... was the manufacture of capacitors." Supp. Tuttle Aff. at para. 6. The main business of Aerovox appears still to be the manufacture of capacitors. Supp. Tuttle Aff.

**9.** Indeed, the 1978 agreement required Aerovox Industries to change its corporate name to a name dissimilar to "Aerovox." At the closing, Aerovox Industries therefore changed its name back to Belleville Industries, Inc.

**10.** Three of Belleville's eight directors became Aerovox directors. Aerovox has only four directors. *See* Belleville Industries, Inc. Articles of Dissolution at 5; Aerovox, Inc. Articles of Organization at 4.

**11.** Indeed, Loren D. Barre, chair of RTE's board of directors and a member of the Aerovox board, submitted an affidavit which makes clear that this continuity of management and work force was essential to Aerovox's continued vitality. In relevant part, Mr. Barre's affidavit states:

When Belleville's assets were acquired in October, 1978, neither I nor anyone else at RTE knew anything about the manufacture of electrical capacitors or how to operate Aerovox. Obviously, however, RTE wanted Aerovox to be run efficiently. It was our opinion that that would best be done by leaving the responsibility for the operations of Aerovox in the hands of the Aerovox personnel who knew the business.

Affidavit of Loren D. Barre at para. 6(a).

the *de facto* merger doctrine. *See, e.g., Cinocca*, 400 F.Supp. at 531; *In Re Master Key Antitrust Litigation*, 1977–1 Trade Cases (CCH) para. 61,456 at 71,733–34, 1976 WL 1377 (D.Conn.1976); *cf. Knudson Dairy Prods. Co. v. State Bd. of Equalization*, 12 Cal.App.3d 47, 90 Cal.Rptr. 533 (1970) (holding that one corporation was liable under a successor liability statute for the tax indebtedness of a second corporation where the parent of both corporations had paid the second for giving its assets to the first by reducing the second's indebtedness to the parent in an amount equal to the value of the assets); 26 U.S.C. sec. 368(a)(1)(C) (treating exchanges involving the acquiring entity's stock or the acquiring entity's parent's stock equally as mergers, not asset sales, in an attempt to distinguish between mere acquisitions of assets and transactions more akin to mergers for tax purposes).[12]

Indeed, no logical reason exists for requiring that the shares exchanged for the seller's assets be only those of the purchasing corporation. Where, as here, the purchasing corporation is a wholly-owned subsidiary, the result achieved is virtually the same. This truth is plainer if one assumes, by way of example, that the Aerovox stock was RTE's only asset. In that case, a proportionate share of RTE stock would provide the former Belleville stockholders the same equity interest, and would have the same practical consequences, as a distribution of Aerovox stock. In the language of the cases, the Belleville shareholders would become "a constituent part of the purchaser corporation." *Dayton*, 739 F.2d at 693. This result is not changed simply because RTE in fact holds other assets beyond the Aerovox stock. Presumably, the parties structured the transaction to reflect the proportionate value of the additional subsidiary.

■ Moreover, it appears that Massachusetts law would have permitted the RTE stock to be used as consideration in a *de jure* merger between Aerovox and Belleville. *See* Mass.Gen. Laws ch. 156B, sec. 78. The rationale and equitable impulse

behind the *de facto* merger doctrine applies to all transactions which would constitute a *de jure* merger if the proper papers were filed. Given the seemingly infinite permutations of corporate acquisitions emerging in today's climate of frenzied merger and acquisition activity, it would be unduly technical to limit the reach of the *de facto* merger doctrine to assets sales made solely with the purchaser's own stock. Accordingly, the Court holds that the requirement of continuity of shareholders is satisfied where the "purchasing corporation" exchanges shares of its parent corporation for the assets of the transferor. Acquiring Belleville through a wholly-owned subsidiary was an effective way for RTE to protect *itself* from liability. *See In re Acushnet River*, 675 F.Supp. at 30–35. The acquisition's structure did not, however, insulate Aerovox from succeeding to Belleville's liability.

Indeed, to hold otherwise would effectively gut the *de facto* merger doctrine. To avoid successor liability, a purchasing corporation would merely need to create a wholly-owned subsidiary to formally acquire the assets of a corporation and pay for those assets with its own stock. Such a result is neither requisite nor wise.

Aerovox next argues that the *de facto* merger doctrine is inapplicable here because Belleville "maintains its corporate existence and is amenable to suit." *Cf. Roy v. Bolens Corp.*, 629 F.Supp. 1070, 1073 (D.Mass.1986) (holding that the successor liability doctrine does not apply in a products liability case where "the original manufacturer remains in existence to respond in tort for its alleged negligence and breach of warranty") (citation omitted). This argument fails because its requisite factual underpinnings do not completely harmonize with the facts of this case. In fact, Belleville did cease business operations, liquidate, and dissolve promptly after the closing, precisely as it was required to do under the 1978 agreement. Only in 1981, when Aerovox filed a petition pursuant to Mass.Gen. Laws ch. 156B, sec. 108, was Belleville revived by the Secretary of

---

**12.** For the text of 26 U.S.C. sec. 368(a)(1)(C), *see* *infra* note 14.

State for the limited purpose of defending this litigation. Indeed, Belleville challenged that revival in the courts of the Commonwealth, but lost. *RTE Corp. v. Belleville Indus., Inc.*, No. 13456 (Bristol Co.Super.Ct., August 26, 1988) (appeal noticed March 13, 1989).

Thus, the rationale of *Roy* has no application here at all. In *Roy*, the predecessor corporation continued in existence and thus remained able to respond in damages. *Roy*, 629 F.Supp. at 1073. Conversely, Belleville has carried on no corporate business operations, had liquidated and dissolved prior to its revival, and has no apparent assets except for an insurance policy, which may or may not cover CERCLA liability.[13] Moreover, no vehicle was established here to protect third parties with claims against Belleville. In some cases, courts have hesitated to impose successor liability under the *de facto* merger doctrine where the transferor corporation set aside a reserve fund from which its liabilities to third parties could be satisfied. *Cf. Menacho*, 420 F.Supp. at 132–33. Here, however, the escrow account contained 55,000 RTE shares which were expressly set aside only for the protection of Aerovox and RTE. Aerovox and RTE were entitled to make claims to the escrow agent in order to be reimbursed for claims or damages they paid arising out of Belleville's liabilities. The escrow agent was authorized to deliver shares only to RTE and Aerovox during the term of the agreement. No third parties could claim against the fund. *See* Agreement and Plan of Reorganization of September 28, 1978 at 3, 31; Escrow Agreement at 2–3.

Finally, the tax treatment of the transaction militates in favor of finding a *de facto* merger. The 1978 agreement provided that each party's obligation to close the deal was conditioned upon receiving an opinion letter stating that the transaction was a tax free reorganization within the meaning of 26 U.S.C. sec. 368(a)(1)(C). Section 368, in conjunction with 26 U.S.C. sec. 354(a), allows certain transactions to receive the same beneficial tax treatment given *de jure* mergers. Specifically, subsection (a)(1)(C) of section 368 provides that, under specified conditions, a stock-for-assets acquisition will be treated as a "reorganization."[14] The purpose of this section of the statute is "to permit changes in corporate structure that are primarily changes in form similar to statutory mergers." *Pierson v. United States*, 472 F.Supp. 957, 968 (D.Del.1979) (footnote omitted) (discussing the stock-for-stock provision of 368[a][1][B]), *rev'd on other grounds, Heverly v. Comm'r*, 621 F.2d 1227 (3d Cir.1980), *cert. denied*, 451 U.S. 1012, 101 S.Ct. 2351, 68 L.Ed.2d 865 (1981). Against this background, Aerovox's claim that it did not "intend" a merger rings hollow. In reality, it was a bargained for

---

**13.** In addition, the United States also asserts that, as a successor to Belleville, "Aerovox would be able to collect on the insurance coverages in the shoes of Belleville," assuming that the policies do cover CERCLA liability. Transcript of July 30, 1986 Hearing at 10.

Aerovox further asserts that Mass.Gen. Laws ch. 156B, sec. 45 renders the shareholders of Belleville liable for any damages and thus successor liability should not be imposed on it. The problems with this argument are numerous. First, it is unclear to this Court whether section 45 was meant to reach the assets of former shareholders more than a decade after the dissolution of a corporation. As a practical matter, moreover, it is by no means clear how much, if any, of the damages that conceivably could be awarded in this case would be recoverable against these former shareholders. The former shareholders may be impossible to find, may no longer possess assets equal to the distribution or may have received too little to offset an even-tual award. Thus, such chimerical hopes rest but lightly on the equitable scales of the successor liability doctrine.

**14.** 26 U.S.C. sec. 368(a)(1)(C) provides:
Section 368.
(a) Reorganization.
(1) In general. For purposes of parts I and II and this part, the term "reorganization" means—

\*　\*　\*　\*　\*　\*

(C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of substantially all of the properties of another corporation, but in determining whether the exchange is solely for stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded.

precondition of the sale that the financial world view the transaction as a mere "pooling of interests," and that the Internal Revenue Service view it as a simple change in corporate form. As the *Cinocca* court observed in holding a company liable although its parent's stock was used to purchase the assets of its predecessor:

> it is difficult to understand how the transaction delineated by the Agreement can be a mere sale of assets for purposes of a transfer of liability for obligations and at the same time a tax exempt exchange under 26 U.S.C. sec. 368(a) which cannot be a mere purchase of assets.

*Cinocca,* 400 F.Supp. at 531; *see also In re Master Key Antitrust Litigation,* 1977–1 Trade Cases (CCH) at 71,734 (holding that a transaction was a *de facto* merger for the purposes of imposing antitrust liability on the successor corporation in part because the transaction was structured as a reorganization to take advantage of section 368[a][1][C] tax breaks).

In summary, this Court will not enforce Aerovox's attempt to separate the burdens from the benefits of acquiring Belleville. The transaction was structured to provide the maximum continuity possible. Aerovox continued to trade on the goodwill built up by Belleville and remained to its customers and creditors an essentially unchanged company. But for the putative disclaimer of PCB liability, the transaction was indistinguishable from a *de jure* merger.[15] It would be manifest injustice under these circumstances to permit Aerovox to contract away Belleville's liability for PCB contamination. However, as *de facto* merger is an equitable doctrine, the Court believes it is appropriate under the circumstances, so long as no additional burden of proof is placed upon the plaintiffs, to re-

quire that the assets of Belleville must first be looked to to satisfy any damages resulting from the releases of Belleville. That said, the Court leaves until further hearing a decision on the burden each party will bear at trial.

---

15. The foregoing analysis, establishing that this transaction was a *de facto* merger, also establishes that Aerovox, the purchaser corporation, is a mere continuation of Belleville, the seller corporation. Thus, the transaction falls within the continuation exception to the general rule of purchaser nonliability, as well as the *de facto* merger exception.

Indeed, the distinction between the two exceptions seems more apparent than real. Upon examination, the *de facto* merger exception subsumes the continuation exception. *See, e.g., Dayton,* 739 F.2d at 693 (holding that " '[T]he key element of a "continuation" is a common identity of the officers, directors and shareholders in the selling and purchasing corporations' ") quoting *Leannais v. Cincinnati, Inc.,* 565 F.2d 437, 440 (7th Cir.1977); *Lumbard v. Maglia,* 621 F.Supp. 1529, 1535 (S.D.N.Y.1985) (holding that "[f]or a *de facto* merger to occur, there must be continuity of the successor and predecessor corporations").