James GOGUEN, as Administrator of the Estate of Ernest Goguen, Plaintiff,

v.

TEXTRON INC. and Bridgeport Machines, Inc., Defendants.

Civil Action No. 02–40245–FDS.

United States District Court, D. Massachusetts.

Feb. 27, 2007.

er the machine was manufactured in 1966 or 1968. Summary judgment will therefore be denied.

## I. *Factual Background*

The facts are set forth in the light most favorable to the plaintiff.

### A. *The Accident*

On June 16, 1999, Ernest Goguen was working at the G & W Foundry in Rehoboth, Massachusetts. He was using a milling machine, which is a machine tool in which metal stock is fed against one or more rotating cutters. While operating the machine, his sleeve became caught in a rotating drill bit. As the sleeve wrapped more tightly around the drill bit, it tightened around Goguen's neck and strangled him to death.

### B. *Textron's Purchase of the Assets of Bridgeport I*

Prior to 1968, The Bridgeport Machines, Inc. ("Bridgeport I") was a manufacturer of machine tools headquartered in Bridgeport, Connecticut. Among other things, Bridgeport I manufactured milling machines.

On March 1, 1968, Textron Inc. purchased the assets of Bridgeport I, and assumed certain liabilities, for $82 million. Under the purchase agreement, Textron agreed "to purchase from [Bridgeport I], ... all its property, assets, and business...." The purchase agreement also provided that Textron "shall assume and agree to pay [or perform] and discharge" various liabilities of Bridgeport I, including, among other things, purchase and sales agreements made in the ordinary course of business, certain balance sheet liabilities, and certain income tax liabilities. The agreement further provided: "Except as expressly provided herein, Textron shall

David W. Heinlein, Jeffrey S. Beeler, Heinlein & Beeler, PC, South Natick, MA, for Plaintiff.

Gerald C. Demaria, John F. Kelleher, Higgins, Cavanagh & Cooney LLP, Providence, RI, for Defendants.

## MEMORANDUM AND ORDER ON MOTION FOR SUMMARY JUDGMENT

SAYLOR, District Judge.

This is a products liability case arising from the allegedly wrongful death of Ernest Goguen. Jurisdiction is based on diversity of citizenship. Goguen was killed in an industrial accident while operating a Bridgeport milling machine. Defendant Textron Inc. has moved for summary judgment on the grounds that it did not design, manufacture, or sell the machine.

There are two principal disputes. The first is whether the machine at issue was manufactured in late 1968 (in which case it was manufactured by Textron) or 1966 (in which case it was manufactured by The Bridgeport Machines, Inc., a predecessor company). The second is whether, if it was manufactured in 1966, Textron can be held responsible for any defects in the machine on a theory of successor liability. For the reasons set forth below, the Court concludes that Textron cannot be held responsible if the machine was manufactured by its predecessor, but that there is a genuine issue of disputed fact as to wheth-

not assume or become liable for any obligations or liabilities of [Bridgeport I]. . . ."

Textron did not purchase any of the stock of Bridgeport I, or exchange any of its own stock as consideration for the purchase of the assets. No shareholder of Bridgeport I became a shareholder of Textron as a result of the purchase. The directors of Bridgeport I as of March 1, 1968, did not become directors or officers of Textron.

Following the purchase, Bridgeport I changed its name to B.M.C. Liquidating Company and dissolved two months later, on April 30, 1968. The Bridgeport Machines Division of Textron began to manufacture Bridgeport milling machines using the same trademarks and trade names, equipment, machinery, and employees of Bridgeport I, and at the same manufacturing locations.

### C. Textron's Sale of the Assets to Bridgeport II

More than eighteen years later, on May 7, 1986, Textron entered into a purchase and sale agreement with Bridgeport Machines, Inc. ("Bridgeport II"). Bridgeport II purchased the assets of Textron's Bridgeport Machines Division, including assets formerly owned by Bridgeport I. On February 14, 2002, Bridgeport II filed for Chapter 11 bankruptcy protection in the Bankruptcy Court for the District of Delaware. On May 13, 2002, the Bankruptcy Court granted relief from the automatic stay provisions of the Bankruptcy Code with respect to a number of claims, including "[a]ny action following a demand for relief under Massachusetts General Laws Chapter 93A, made by the estate of James (sic) Goguen."

### D. The Date of Manufacture of the Machine

Plaintiff contends that the milling machine was defective and that the manufacturer failed to include proper warnings. It is undisputed that the milling machine at issue was a Bridgeport model. There is a dispute, however, as to whether it was manufactured by Bridgeport I in 1966 or by Textron in late 1968. Textron has made substantially inconsistent statements as to the date of manufacture of the milling machine and the identity of the manufacturer.

The first such statement was allegedly made by in-house counsel for Textron. Counsel for plaintiff filed this action against Bridgeport II in the Worcester Superior Court on June 12, 2002.[1] Bridgeport II did not respond to the complaint, and a default was entered on August 7. At some point, counsel for plaintiff began to communicate with the general counsel's office of Textron to discuss a variety of issues, including removal of the default that had entered against Bridgeport II and the assumption of the defense of the case by Textron.

On October 1, John A. Rupp, Assistant General Counsel of Textron, wrote to counsel for plaintiff:

> [If plaintiff] will vacate voluntarily the [default] against [Bridgeport II], I will work to verify that the accident equipment was a Textron-manufactured component. If this is in fact accurate, Textron Inc. will consent to service of process in the Goguen [case] . . .

According to plaintiff's counsel, Rupp advised him on October 2 that the machine at issue was manufactured by Textron. Plaintiff's counsel's note of the conversa-

---

1. As noted, Bridgeport II had filed for bankruptcy in February 2002. The bankruptcy court, however, had granted relief from the automatic stay in May 2002.

tion states as follows: "10/2/02 tcw John Rupp. Textron is manufacturer."

On November 25, plaintiff filed an amended complaint adding Textron as a party defendant. Textron was served on December 4; it is unclear whether it consented to service, although no summons or return of service is on file. Textron answered the complaint and removed the case to this Court on December 18.

On December 20, Gerald C. DeMaria, of Higgins, Cavanagh & Cooney, LLP, outside counsel to Textron, wrote to counsel for plaintiff:

> Records currently available indicate that the machine at issue was manufactured and sold in 1968. We are continuing to further investigate the date of manufacture and will let you know when we have further information.

On June 9, 2003, Textron provided answers to plaintiff's interrogatories. Among the answers was the following:

> *INTERROGATORY NO. 7:* Please set forth the dates:
> a. of manufacture of the subject machine . . .
> *ANSWER:*
> a. the product was manufactured in November/December, 1968.

The interrogatory answers were executed by Sandra F. Jack, who identified herself only as an "Authorized Representative of Textron Inc."

Plaintiff's counsel then noticed a deposition of Textron under Fed.R.Civ.P. 30(b)(6). Joseph Soares was designated by Textron in response to the deposition notice to provide testimony on its behalf.[2] At his deposition on June 28, 2004, Soares gave the following testimony:

Q Mr. Soares, have you had a chance to look at the machine down at the foundry in Rehoboth?

A Yes.

Q And you had an opportunity to take some of the serial numbers off that machine at that time; is that correct?

A Yes.

Q And now that you have compared those serial numbers to information that you had in terms of historical data from Bridgeport, is it your understanding that the machine involved in Mr. Goguen's death was manufactured in 1966; is that correct?

A That's correct.

His deposition was apparently not completed, and was resumed on August 13, 2004. Soares then gave the following testimony:

Q And when you were describing this point of operation guard that was added in 1982, am I correct that you said a perceived risk? Is that the phrase you used?

A Yeah. I'm not the safety expert, so I did not take part in the study to define that risk and try to study it and come up with some quantifiable measurements as to how likely some injury could happen from that and how severe that injury would be. So it's a potential that someone could come in contact with the point of operation. The machine is designed— the machine itself, *when it was designed in 1968,* was designed in such a way that a machine operator has no reason to come close to the point of operation . . . .

(emphasis added).

On an unknown, but apparently subsequent, date, Textron amended its interrogatory answer as follows:

---

2. The position and background of Mr. Soares is not set forth in the record.

*INTERROGATORY NO. 7:* Please set forth the dates:

a. of manufacture of the subject machine ...

*DEFENDANT'S AMENDED ANSWER TO INTERROGATORY NO. 7:*

a. the final assembly of the machine in question occurred in or about October, 1966.

It is unclear who executed the amended interrogatory responses, or indeed whether they were executed at all; the signature page is not included in the record. Textron has submitted no explanation as to why it decided to amend its interrogatory answer, or otherwise as to why it changed its position on the date of manufacture of the machine.

In connection with its motion for summary judgment, filed on May 16, 2005, Textron submitted an excerpt from the "Serial Number Reference Book for Metalworking Machinery—11th Edition," published by the "Machinery Dealers National Association." At pages 114–15 is a list of what appears to be serial numbers for Bridgeport milling machines for each year from 1950 to 1977. Plaintiff moved to strike the excerpt on the grounds that it had not been authenticated. Textron did not attempt to cure the problem, but instead argued that the excerpt was self-authenticating under Fed.R.Evid. 902. On March 8, 2006, the Court granted the motion to strike the excerpt. Without leave of Court—but without objection from plaintiff—Textron then submitted an affidavit of Mark Robinson, Executive Vice President of the Machinery Dealers National Association, purporting to authenticate the reference book excerpt.[3]

The excerpt indicates that Bridgeport milling machines manufactured in 1966 bore the serial numbers BR88180 to BR98089. The machine at issue bears the serial number "J-94340." According to the list of serial numbers, and without regard to the letter prefixes, this suggests that the machine was manufactured in 1966, and therefore was manufactured by Bridgeport I.[4]

## II. *Procedural Background*

In October 2004, Textron identified a former employee named Bahikhaji Maneckji as a Rule 30(b)(6) witness on successor liability issues. In February 2005, Textron also identified a former employee of Bridgeport I named Joseph Clancy as an additional Rule 30(b)(6) witness. Because counsel could not agree on the scheduling of the depositions, neither deposition ever took place. Plaintiff subsequently filed a motion for sanctions or to compel production of the witnesses.

On May 16, 2005, Textron moved for summary judgment on the grounds that it did not manufacture or sell the milling machine at issue; that it did not own the

---

3. As noted, the Court struck the excerpt on the ground that it had not been authenticated. Textron then did what it should have done in the first instance—submit a simple authenticating affidavit. It did not, however, request or obtain leave of Court to do so. Because the Court ultimately concludes that summary judgment should be denied, it will assume, without deciding, that the authenticated excerpt is properly part of the record.

4. Textron has submitted no evidence indicating that the serial number is J-94340, but that fact appears to be undisputed. Textron's Statement of Undisputed Material Facts, submitted pursuant to Local Rule 56.1, states: "3. The serial number assigned by Bridgeport for production of the allegedly defective machine is 94340." Plaintiff's response to the statement is as follows: "The Plaintiff admits that one of the serial numbers on the subject machine is J94340." In addition, plaintiff has submitted a copy of a letter from plaintiff's counsel dated February 25, 2002, stating, "Our investigation has revealed that at the time of his death, Mr. Goguen was working with a Bridgeport milling machine, Serial No. J-94340...."

entity that manufactured the machine; and that it cannot be held liable on a theory of successor liability. At the same time, plaintiff filed a motion to strike certain exhibits submitted by Textron in support of its motion on grounds of lack of proper authentication.

On March 8, 2006, the Court issued an order (1) requiring Textron to make one or more witnesses available for deposition pursuant to Rule 30(b)(6) by April 7, 2006; and (2) denying Textron's motion for summary judgment without prejudice, permitting the parties to file supplemental memoranda after the conclusion of the Rule 30(b)(6) depositions, and deeming the summary judgment motion to have been renewed on April 18, 2006, unless withdrawn or modified. The same day, the Court issued a further order granting in part plaintiff's motion to strike. The Court struck both Exhibit C (the excerpt from the reference book containing serial numbers for metal working machinery) and Exhibit G (Textron's annual reports for 1967 and 1968) on the grounds that defendant had failed to authenticate the documents.

On April 18, 2006, Textron filed a supplemental memorandum on summary judgment issues in order to reflect the additional evidence, if any, provided by the witness(es) in those depositions. Textron also submitted additional exhibits, including affidavits purporting to authenticate Exhibits C and G.

### III. *Analysis*

#### A. *Summary Judgment Standard*

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir.1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show,

based upon the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue is one "that a reasonable jury could resolve ... in favor of the non-moving party." *United States v. One Parcel of Real Property*, 960 F.2d 200, 204 (1st Cir.1992). A fact is material "when [it] has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant." *Parrilla–Burgos v. Hernandez–Rivera*, 108 F.3d 445, 448 (1st Cir.1997) (quoting *Martinez v. Colon*, 54 F.3d 980, 984 (1st Cir.1995)). The court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993).

As noted, there are two principal issues in this matter. The first is whether the machine in question was manufactured in 1968 by Textron (in which case summary judgment must be denied) or in 1966 by Bridgeport I. The second is whether, if the machine was manufactured by Bridgeport I, Textron can nonetheless be held responsible on a theory of successor liability. The Court will consider the second issue first, because if Textron can be held responsible either way, the Court need not reach the issue of the date of manufacture.

#### B. *Whether Textron Can Be Held Responsible for the Products of Bridgeport I on Principles of Successor Liability*

The 1968 transaction between Textron and Bridgeport I was structured as

an asset sale, rather than as a stock sale or merger. Ordinarily, the liabilities of a selling predecessor corporation do not pass to the successor corporation following an asset sale, unless

> (1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor.

*Cargill, Inc. v. Beaver Coal & Oil Co., Inc.,* 424 Mass. 356, 359, 676 N.E.2d 815 (1997); see *Guzman v. MRM/Elgin,* 409 Mass. 563, 566, 567 N.E.2d 929 (1991). Plaintiff here asserts that Textron can be held responsible for any design or manufacturing defects in the products of Bridgeport I on three theories of successor liability: (1) that Textron implicitly assumed liability based, in part, on the terms of Textron's purchase agreement; (2) that the transaction between Textron and Bridgeport I was a de facto merger; and (3) that Textron was a "mere continuation" of Bridgeport I under Massachusetts law.

### 1. *Implicit Assumption of Liability under the Purchase Agreement*

Plaintiff first contends that Textron impliedly agreed to assume liability for any future product liability claims against Bridgeport I. The sole basis for this claim is that Bridgeport I was required under the 1968 Purchase and Sale Agreement to provide Textron with a schedule of all lawsuits pending against it at the time of the sale. According to plaintiff, this implies that Textron impliedly agreed to defend and provide indemnification against any lawsuits then existing or to be brought in the future.

■ Plaintiff has not put forth any material evidence as to this issue other than the text of the Purchase and Sale Agreement itself.[5] Under the terms of the agreement, Textron expressly assumed certain liabilities of Bridgeport I. Section 3(g) of the Purchase Agreement states, "Except as expressly provided herein, Textron shall not assume or become liable for any obligations or liabilities of [Bridgeport I]. . . ." No reasonable jury could conclude from that language that Textron *impliedly* assumed any other liabilities of Bridgeport I, including liability for any future claims alleging personal injuries and/or wrongful death arising out of any products manufactured by Bridgeport I prior to March 1, 1968. Moreover, the mere requirement that the seller provide a list of pending litigation at the time of the sale can hardly suffice as evidence that Textron intended to assume an extensive, open-ended indemnification obligation—not only as to the listed cases (as to which there is no evidence), but as to all other future lawsuits, as well. Plaintiff therefore has failed to establish the existence of a triable issue of fact as to this theory.

### 2. *De Facto Merger*

■ Plaintiff next contends that the 1968 transaction was a de facto merger or consolidation. In Massachusetts,

> [t]he factors that courts generally consider in determining whether to characterize an asset sale as a de facto merger are whether (1) there is a continuation of the enterprise of the seller corporation so that there is continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be

---

5. The record also includes excerpts from the deposition of Bahikhaji Maneckji, former in-house counsel at Textron, explaining the terms of the agreement.

held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; whether (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Cargill,* 424 Mass. at 359–60, 676 N.E.2d 815. Of those factors, "no single [one] is necessary or sufficient to establish a de facto merger." *Id.* at 360, 676 N.E.2d 815.

Plaintiff argues that three of the four *Cargill* criteria are satisfied in this case: (1) the manufacturing locations, employees, products, and general business operations of Bridgeport I remained the same after the sale; (2) Bridgeport I ceased operations and liquidated within a short period after the sale; and (3) Textron assumed various obligations (such as trade payables) "necessary for the uninterrupted continuation of normal business operations."[6] Based on its review of the record, the Court agrees.[7]

The "continuity of shareholders" criterion, however, is more troublesome. Textron paid cash for the assets of Bridgeport I, and thus no shares exchanged hands.

Plaintiff, however, argues that a stock transfer is not a prerequisite to the application of the de facto merger doctrine, citing *Cargill* and *In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution,* 712 F.Supp. 1010, 1017 (D.Mass.1989).

It is true that under Massachusetts law the application of the de facto merger doctrine is not limited to asset purchases made *solely* with the purchaser's own stock. *See Cargill,* 424 Mass. at 361, 676 N.E.2d 815 ("there is no requirement that there be complete shareholder identity between the seller and a buyer before corporate successor liability will attach."). In *Cargill,* the sole shareholder, officer, and director of the selling company became a director of the acquiring company and received a 12.5% shareholder interest in that company, apparently purchased with the sale proceeds (the selling company received cash, a promissory note, and an agreement to assume certain debts). 424 Mass. at 358, 361, 676 N.E.2d 815. In *Acushnet,* the selling company received stock of the parent company of the acquiring company. 712 F.Supp. at 1017 ("... the Court holds that the requirement of continuity of shareholders is satisfied where the 'purchasing corporation' exchanges shares of its parent corporation for the assets of the transferor."). None-

---

6. More specifically, it appears that (1) Textron continued to manufacture Bridgeport milling machines using the trademarks and trade names, equipment, machinery, manufacturing locations, and former employees of Bridgeport I; (2) under the agreement, Textron purchased all of the operating data, records, intangible assets, books, customer lists, credit information, patents, designs, drawings, trademarks, trade names, slogans, processes, formulae, trade secrets, agreements, leases, licenses, insurance policies of Bridgeport I, the businesses of Bridgeport I as going concerns, and the right to use the corporate name of Bridgeport I; and (3) Bridgeport I transferred all of its contracts, leases, licens-

es, and other commitments and title to its real estate to Textron. Three days after the sale, Bridgeport I changed its name to the B.M.C. Liquidating Company, which then was dissolved on April 30, 1968, two months after the sale.

7. It is not entirely clear whether there was "continuity of management" from Bridgeport I to Textron. None of the directors and officers of Bridgeport I became directors or officers of Textron. However, it appears that the senior managers of Bridgeport I managed the Bridgeport Machines Division of Textron immediately after the merger.

theless, plaintiff has cited no Massachusetts authority in which a de facto merger has been found where *no* shares exchanged hands. Furthermore, the First Circuit has observed that continuity of shareholders is one of the "key requirements" for application of the doctrine. *See Dayton v. Peck, Stow and Wilcox Co.,* 739 F.2d 690, 693 (1st Cir.1984).

■ Plaintiff also points to the dicta in *Cargill* that "no single factor is necessary ... to establish a de facto merger," and argues that shareholder continuity is therefore merely a factor to be considered, not a prerequisite to be satisfied. While the Court acknowledges the breadth of the *Cargill* dicta, it also observes that no case has ever gone so far as to dispense with the "shareholder continuity" factor altogether. Furthermore, eliminating the requirement altogether would produce a result almost indistinguishable from the "continuity of enterprise" theory—a controversial approach that has not been adopted in Massachusetts. *See National Gypsum Co. v. Continental Brands Corp.,* 895 F.Supp. 328, 340 (D.Mass.1995); *McCarthy v. Litton Indus., Inc.,* 410 Mass. 15, 23 & n. 6, 570 N.E.2d 1008 (1991).[8] The Court therefore concludes that, on the record evidence, there was no continuity of shareholders, and therefore plaintiff cannot establish that a de facto merger occurred between Textron and Bridgeport I.

The Court is cognizant of the fact that strict adherence to the de facto merger doctrine is not without significant potential costs. In particular, the harm to an injured plaintiff (who may be entirely foreclosed from any remedy) may greatly outweigh the harm to the defendant (who, at least in theory, can insure against the risk or otherwise spread or shift the costs). Nonetheless, it is not the proper role of this Court to depart from long-established principles of corporate law. In the words of the First Circuit in *Dayton,* rejecting the proposed adoption of a "product line" theory of successor liability:

> ... we are in a particularly poor position, sitting as a federal court in a diversity case, to endorse the fundamental policy innovation implicit in the product line theory. Absent some authoritative signal from the legislature or the courts of Massachusetts, we see no basis for even considering the pros and cons of innovative theories of successor corporate liability. We must apply the law of the forum as we infer it presently to be, not as it might come to be. Although Massachusetts authority is sparse, we see no basis for applying any rule other than the traditional one.

739 F.2d at 694–95 (footnotes and citations omitted).

### 3. *"Mere Continuation" of Predecessor*

■ Finally, plaintiff contends that Textron was the "mere continuation" of Bridgeport I. Under this theory, imposition of liability on the purchasing corporation is justified on the grounds that the purchasing corporation, in substance if not in form, is the same company as the selling corporation. *McCarthy v. Litton Indus., Inc.,* 410 Mass. 15, 21–22, 570 N.E.2d 1008 (1991). Accordingly, "the indices of 'continuation' are, at a minimum: continuity of directors, officers, and stockholders; and the continued existence of only one corpo-

---

**8.** In support of his position, plaintiff cites a decision of the Michigan Supreme Court, *Turner v. Bituminous Cas. Co.,* 397 Mich. 406, 244 N.W.2d 873 (Mich.1976), which is the leading case on the "continuity of enterprise" theory. The *Turner* theory, however, has not been adopted in Massachusetts. *See National Gypsum,* 895 F.Supp. at 340. Plaintiff does not argue for a "product line" theory, as set forth in *Ray v. Alad Corp.,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (Cal.1977). *See Dayton,* 739 F.2d at 694.

ration after the sale of assets." *Id.* at 23, 570 N.E.2d 1008; *see also Dayton,* 739 F.2d at 693. As noted above, there was no continuity of shareholders, directors, or officers, and therefore this theory is not applicable.

Accordingly, Textron cannot be found liable for the product liability obligations, if any, of Bridgeport I under Massachusetts law. The Court next turns to the issue of whether the machine was designed and manufactured in 1966 (by Bridgeport I) or 1968 (by Textron).

## C. *Whether the Machine Was Manufactured by Textron or Bridgeport I*

Textron contends that the evidence is overwhelmingly clear that the machine was manufactured in 1966 by Bridgeport I. Plaintiff has admitted that the machine bears serial number J–94340, and the Serial Number Reference Book for Metalworking Machinery—an independent source, published by a trade association—indicates that a Bridgeport machine bearing that number would have been manufactured in 1966.

█ Unfortunately for Textron, there is substantial conflicting evidence in the record. On at least four different occasions—twice under oath—a representative of Textron has stated or suggested that the machine was manufactured in 1968 by Textron.

First, on October 2, 2002, according to plaintiff's counsel, in-house counsel at Textron advised him over the telephone that "Textron is [the] manufacturer."

Second, on December 20, 2002, outside counsel for Textron stated in a letter to plaintiff's counsel that "Records currently available indicate that the machine at issue was manufactured and sold in 1968."

Third, on June 9, 2003, an "authorized representative" of Textron executed inter-

rogatory responses that stated that "the product was manufactured in November/December 1968."

Fourth, on August 13, 2004, Textron's 30(b)(6) designee testified that the machine "was designed in 1968."

All of those statements would be admissible at the trial against Textron as admissions of a party-opponent. *See* Fed. R.Evid. 801(d)(2)(A), (C), (D). Under ordinary circumstances, the existence of such substantial evidence on both sides of a material disputed fact would clearly be sufficient to preclude summary judgment. The present case is peculiar, however, in that (1) all of the contradictory evidence was supplied by Textron itself, not the plaintiff or third parties; and (2) there is obviously a strong likelihood that the more recent and apparently objective evidence (the serial number and the trade directory) supplies the correct answer. Neither factor, however, is sufficient to grant summary judgment for Textron.

█ The mere fact that Textron itself is the source of the competing evidentiary claims does not require the Court to consider only the most recent version, or the version most favorable to Textron. It is well-established that "a party *opposing* summary judgment may not *manufacture* a dispute of fact by contradicting his earlier sworn testimony without a satisfactory explanation of why the testimony is changed." *Abreu–Guzman v. Ford,* 241 F.3d 69, 74 (1st Cir.2001) (emphasis added); *see Colantuoni v. Alfred Calcagni & Sons, Inc.,* 44 F.3d 1, 4 (1st Cir.1994). The Court sees no reason why the inverse should not be true: a party *seeking* summary judgment cannot *avoid* a dispute of fact by contradicting its earlier sworn testimony—at least without a satisfactory explanation.

Here, Textron has offered no explanation, much less a satisfactory explanation,

as to why it changed its position concerning the date of manufacture from 1968 to 1966. Textron's counsel's letter stated that the earlier position was based on "[r]ecords currently available," but no such records have been submitted to the Court, nor any explanation as to why those records proved to be inaccurate or unreliable.[9] There may be a satisfactory, indeed entirely credible, explanation, but Textron has not provided it.

The Court is thus left with two possible conclusions: either there is a genuine dispute as to the date of manufacture, or Textron made incorrect or ill-advised admissions without the benefit of a thorough investigation. Either way, summary judgment is not appropriate. It may well be the case, at the end of the day, that the evidence overwhelmingly and conclusively establishes that the machine was manufactured in October 1966 by Bridgeport I. There is, nonetheless, substantial evidence to the contrary, and under the circumstances, the Court has no real alternative but to deny summary judgment.

### IV. Conclusion

For the foregoing reasons, the motion of defendant Textron, Inc., for Summary Judgment is DENIED.

**So Ordered.**

---

9. The record does not reveal whether plaintiff requested the production of such records in discovery.