**KLEEN LAUNDRY AND DRY CLEANING SERVICES, INC.**

v.

**TOTAL WASTE MANAGEMENT CORP.**

**Civ. No. 91–493–JD.**

United States District Court, D. New Hampshire.

March 19, 1993.

---

Franklin G. Stearns, Boston, MA, Eleanor H. MacLellan, Concord, NH, for plaintiff.

Andrew W. Serell, Concord, NH, for defendant.

## ORDER

DiCLERICO, Acting Chief Judge.

Plaintiff Kleen Laundry and Dry Cleaning Services, Inc. ("Kleen") is seeking recovery of costs from defendant Total Waste Management, Inc. ("TWM") that Kleen has incurred and will incur in the future from responding to releases and threatened releases of hazardous substances and oil on and about Kleen's property located in Lebanon, New Hampshire (the "site"). The plaintiff alleges those releases and threatened releases occurred as a result of underground storage tank removal activities performed by the defendant and as a result of oil and hazardous waste storage and disposal activities allegedly undertaken by Portland Waste Oil, Inc. ("Portland Waste Oil"), George West and Sons d/b/a Portland Oil Recycling ("George West") and Conn–Val Oil Recycling ("Conn–Val"). The plaintiff contends the defendant is a successor in interest to these three entities and therefore is liable for their actions.

The court has jurisdiction over the plaintiff's successor liability claim pursuant to sections 107(a) and 113(f)(1) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.A. § 9601 *et seq.* (West 1983 & Supp.1992). The court has supplemental jurisdiction, pursuant to 28 U.S.C.A. § 1367(a) (West Supp.1992), over the plaintiff's state law claims under N.H.Rev.Stat.Ann. § 146–A:10 (1990 & Supp. 1991), N.H.Rev.Stat.Ann. § 147–B:10 (1990 & Supp.1991) and under New Hampshire common law tort and contract principles.

The defendant has moved for summary judgment in its favor on the plaintiff's successor liability claim, arguing there is no evidence to support the plaintiff's claim that the defendant is liable as a successor to any entity which may have used the underground storage tanks identified in the plaintiff's complaint. In addition, the defendant has moved for summary judgment in its favor on the plaintiff's claims based on the defendant's alleged conduct at the site, arguing that those claims are barred by the New Hampshire statute of limitations, N.H.Rev.Stat. Ann. § 508:4 (Supp.1991). The plaintiff counters that summary judgment is not appropriate because there are genuine issues of material fact regarding both claims. The defendant has also moved to strike portions of an affidavit filed by the plaintiff in support of its objection to the defendant's summary judgment motion. The defendant argues the statements in the affidavit are inadmissible under Fed.R.Evid. 408 because they were made in the course of settlement negotiations. The plaintiff counters that the statements are admissible because they were made at a time when there was no disputed "claim" within the meaning of Rule 408 and because they would be "otherwise discoverable."

For the following reasons, the court grants the defendant's motion to strike. However, the court denies defendant's motion for summary judgment.

## Background

Beginning in the late 1970s or early 1980s, the plaintiff alleges that Portland Waste Oil and/or George West, through Conn–Val, leased two 20,000 gallon underground storage tanks on the site pursuant to a leasehold agreement signed by the plaintiff and Conn–Val representatives. The leasehold agreement permitted Conn–Val to take certain actions with respect to the tanks for use by Conn–Val, including locking the tanks and building an earthen dam around the tanks. The leasehold agreement also contained an indemnity clause in which Conn–Val agreed to absolve the plaintiff of all liability related to the two tanks. During the course of the lease, the plaintiff alleges Portland Waste Oil, George West and/or Conn–Val Recycling generated, transported, stored and/or disposed of oil and hazardous substances in the tanks and on the plaintiff's site. The oil and hazardous substances included used motor oil and waste oil, chlorinated solvents and volatile organic compounds.

In August 1987, the plaintiff hired the defendant to remove the two 20,000 gallon tanks under New Hampshire Department of Environmental Services ("DES") rules. In September 1987, the defendant removed the tanks, and refilled the excavation site with clean sand. After completing the tank removal, the defendant submitted sampling results from the excavation to DES.

In January 1988, DES ordered the plaintiff to perform a thorough investigation of the site. Plaintiff hired a consultant, Wagner, Heindel & Noyes, Inc. ("WHN"), to perform the investigation. On October 18, 1988, WHN issued its Phase I site investigation report concluding that the site was contaminated with oil and hazardous substances and wastes from the underground tanks and that groundwater had been contaminated. WHN's report concluded that groundwater monitoring would be sufficient to deal with the contamination and that site remediation was unnecessary. WHN submitted its re-

port to DES. In December 1988, DES ordered the plaintiff to conduct further investigation at the site and to perform remediation of the soil. On November 1, 1989, WHN issued its Phase II site investigation report in which, the plaintiff states, it was conclusively established that the defendant's conduct was linked to the contamination at the site. The plaintiff alleges it has incurred costs of more than $190,000 since June 30, 1990 to respond to DES requirements.

In addition, the plaintiff alleges that between 1984 and 1988, the defendant purchased and succeeded to the interests of Portland Waste Oil, George West and Conn–Val. The plaintiff bases its allegations of successor liability on a series of asset purchase agreements between the defendant and the three entities, or on the entities' use of the tanks at the site.

## Discussion

### A. Defendant's Motion to Strike

■ The defendant has moved to strike paragraphs 19, 27 and 28 of plaintiff's treasurer James F. Gosslin's affidavit concerning statements made by defendant's vice president and general manager Donald Littlefield, and any reference to those statements in the plaintiff's objection its motion for summary judgment. The challenged statements were made at a July 12, 1991 meeting among Mr. Littlefield, defendant's lawyer Peter Gleichman, plaintiff's lawyer Franklin Stearns and Mr. Gosslin. Plaintiff's lawyer requested the meeting as a "settlement-type meeting before and in order to avert litigation." Defendant's Motion to Strike, Exhibit C.

The defendant contends the July 12, 1991 meeting was a settlement conference and that any statements made there must be excluded pursuant to Fed.R.Evid. 408, which provides, in relevant part, "evidence of conduct or statements made in compromise negotiations is ... not admissible." The defendant further argues that settlement discussions which are inadmissible pursuant to Rule 408 may not be used to support or oppose motions for summary judgment. *See* Fed.R.Civ.P. 56(e); *see also United States v. OCCI Co.,* 758 F.2d 1160, 1165 n. 6 (7th

Cir.1985); *Prudential Ins. Co. v. Curt Bull-ock Builders, Inc.*, 626 F.Supp. 159, 164 (N.D.Ill.1985). The plaintiff counters that Rule 408 does not apply because the statements were made before a formal complaint was filed in this action. As such, the plaintiff contends there was no disputed "claim" to bring these statements within the ambit of Rule 408. The court finds the plaintiff's argument is without merit.

The language of Rule 408 contains no "bright-line" rule requiring that a complaint be filed, and the court believes such a "bright-line" rule would undermine the purpose of Rule 408.

> [F]ree and frank discussions in negotiations leading toward settlement should be fostered in order to protect the courts against excessive litigation to the death.... Since so many of the protected discussions take place after an action has been commenced, *or when it is in the offing,* it seems likely that absence of the rule might inhibit the parties from exploring the possibility of settlement.

Jack B. Weinstein & Margaret A. Berger, 2 *Weinstein's Evidence* ¶ 408[01] (1992) (emphasis added). In addition, the language of the plaintiff's communications to the defendant clearly suggests there is a disputed "claim." [1]

The court recognizes that Rule 408 "does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations." Fed.R.Evid. 408. The plaintiff contends the court should admit Mr. Littlefield's statements because they would be "otherwise discoverable" upon the taking of his deposition. The court agrees that if the statements were presented from an independent source, such as in a deposition, they

would be admissible. *See* Fed.R.Evid. 408 notes of Conference Committee, House Report No. 93–1597. However, the plaintiff has not presented the statements in such a manner, but has offered them solely in the context of the settlement discussions. Under these circumstances, Rule 408 makes the statements inadmissible. Therefore, the court grants the defendant's motion to strike paragraphs 19, 27 and 28 of Mr. Gosslin's affidavit.

**B. Defendant's Summary Judgment Motion**

The role of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Medicine*, 976 F.2d 791, 794 (1st Cir.1992). It is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The defendant bears the initial burden of establishing the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Quintero de Quintero v. Aponte–Roque*, 974 F.2d 226, 227–28 (1st Cir.1992). The court must view the entire record in the light most favorable to the plaintiff, "indulging all reasonable inferences in [its] favor." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). Once the defendant has made a properly supported motion for summary judgment, however, the plaintiff "may not rest upon mere allegation or denials of [its] pleading, but must set forth specif-

---

1. *See, e.g.,* Defendant's Motion to Strike, Exhibit A ("This letter constitutes notice that under New Hampshire statutes Chapters 147–A:9 and 147–A:10, TWM is strictly liable for the above-referenced assessment and remedial costs. Kleen expects that you will be fully responsible for reimbursement of these expenses"); *id.,* Exhibit B ("As the corporate successor to Portland Waste Oil, TWM is strictly liable to Kleen under state and federal environmental statutes for all of Kleen's costs incurred in responding to the release of hazardous substances and oil from the USTs"); *id.* ("Since we did not receive a response to our previous correspondence, we intend to file a cost recovery and damages lawsuit against you if you do not respond to this letter within seven business days of receipt"); *id.,* Exhibit C ("I am writing to follow up on our conversation on June 7, 1991 in which you indicated that you would speak with Total Waste Management about further discussions with us related to Kleen's claim against TWM for liability arising out of the underground storage tanks at the Kleen property in Lebanon, New Hampshire").

ic facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citing Fed.R.Civ.P. 56(e)).

### (1) Successor Liability

CERCLA imposes liability on any "person" who owned or operated a facility at the time hazardous waste was disposed, 42 U.S.C.A. § 9607(a)(2). The term "person" is defined to include "corporations." 42 U.S.C.A. § 9601. While the statute does not indicate whether CERCLA imposes liability on successor corporations, five circuit courts of appeal and numerous district courts have held that it does. *See United States v. Mexico Feed and Seed Co.,* 980 F.2d 478, 486 (8th Cir.1992); *United States v. Carolina Transformer Co.,* 978 F.2d 832, 837 (4th Cir.1992); *The Anspec Co., Inc. v. Johnson Controls, Inc.,* 922 F.2d 1240, 1245 (6th Cir.1991); *Louisiana–Pacific Corp. v. ASARCO, Inc.,* 909 F.2d 1260, 1263 (9th Cir.1990); *Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86, 91–92 (3d Cir.1988), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989); *United States v. Distler,* 741 F.Supp. 637, 640–43 (W.D.Ky.1990); *Westwood Pharmaceuticals v. National Fuel Gas Distrib.,* 737 F.Supp. 1272, 1280 (W.D.N.Y.1990); *In re Acushnet River & New Bedford Harbor Proceedings re: Alleged PCB Pollution,* 712 F.Supp. 1010, 1013 (D.Mass.1989). "The national interest in the uniform enforcement of CERCLA and the same interest in preventing evasion by a responsible party ... are the reasons we think the successor liability is appropriate *where factually justified.*" *Carolina Transformer,* 978 F.2d at 837 (emphasis added) (citing *Louisiana–Pacific,* 909 F.2d at 1263; *Smith Land,* 851 F.2d at 92).

■ The settled common-law rule is that a corporation which acquires the assets of another corporation does not take the liabilities of the predecessor corporation unless one of four generally recognized exceptions are met: (1) the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) the transaction may be considered a *de facto* merger; (3) the successor may be considered a "mere continuation" of the predecessor; or (4) the transaction is fraudulent. *Id.* (citing Fletcher, *Cyclopedia of the Law of Private Corporations,* § 7122 (rev'd ed.1990)). While conceding that the first and fourth exceptions are not applicable in this action, the plaintiff contends that under either the second or third exceptions, the defendant is liable as a successor corporation. The defendant, however, claims it is not liable under either exception because there was never any stock transfer between it and the entities to which the plaintiff alleges it succeeded, nor is there any identity of shareholders between the defendant and any of the entities.

### (A) De Facto Merger Exception

■ When a party alleges that a *de facto* merger has occurred, the court must focus on the substance of the agreement, not on the name the parties have attached to it. *Acushnet River,* 712 F.Supp. at 1015. The court may hold the surviving corporation liable for the conduct of the transferor corporation if the parties have achieved "virtually all the results of a merger," even if they have not observed the statutory requirements of a *de jure* merger. *Id.* "The *de facto* merger doctrine is a judge-made rule that rests on general equitable principles." *Id.*

The court should consider four factors in determining whether to view a purported sale of assets as a *de facto* merger.

(1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the seller ordinarily

necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Id.* (citations omitted). The *Acushnet River* court noted that while all of these factors favor the finding of a *de facto* merger, "no one of these factors is either necessary or sufficient to establish a *de facto* merger." *Id.* (citations omitted).

### (B) Mere Continuation Exception

■ Under the traditional application of the "mere continuation" exception, the court should not find a corporation to be the continuation of a predecessor unless only one corporation remains after the transfer of assets and unless there is an identity of stock, stockholders and directors between the two corporations. *Carolina Transformer,* 978 F.2d at 838. Some courts, however, have adopted a similar but broader theory often called the "continuity of enterprise" or the "substantial continuity" theory. *Id.* (citing *Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168, 175 (5th Cir.1985); Fletcher, *Cyclopedia of the Law of Private Corporations,* § 7123.06 (rev'd ed. 1990)); *cf. Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 43, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987) (citing with approval a similar "substantial continuity" test establishing a new company's obligation to bargain with the old company's unions). Under this theory, the court should consider a series of factors in determining whether one corporation is the successor to another:

(1) retention of the same employees;

(2) retention of the same supervisory personnel;

(3) retention of the same production facilities in the same location;

(4) production of the same product;

(5) retention of the same name;

(6) continuity of assets;

(7) continuity of general business operations; and

(8) whether the successor holds itself out as the continuation of the previous enterprise.

*Carolina Transformer,* 978 F.2d at 838; *see also Mexico Feed,* 980 F.2d at 488 ("in the CERCLA context, the imposition of successor liability under the 'substantial continuation' test is justified by a showing that in substance, if not in form, the successor is a responsible party").

### (C) Application in this Case

■ When the court applies the doctrine of successor liability in CERCLA cases, whether it be under the traditional *de facto* merger or mere continuation exceptions, or under a broader substantial continuity analysis, the court must do so "in such a fashion as to further the goals of [CERCLA]." *Distler,* 741 F.Supp. at 642.

> [CERCLA] views response liability as a remedial, rather than a punitive measure whose primary aim is to correct the hazardous condition. Just as there is liability for ordinary torts or contractual claims, the obligation to take necessary steps to protect the public should be imposed on a successor corporation.
>
> \* \* \* \* \* \*
>
> Expenses can be borne by two sources: the entities which had a specific role in the production or continuation of the hazardous condition, or the taxpayers through federal funds. CERCLA leaves no doubt that Congress intended the burden to fall on the latter only when the responsible parties lacked the wherewithal to meet their obligations.
>
> Congressional intent supports the conclusion that, when choosing between the taxpayers or a successor corporation, the successor should bear the cost. Benefits from the use of the pollutant as well as savings resulting from the failure to use non-hazardous disposal methods inured to the original corporation, its successors and their respective stockholders and accrued only indirectly, if at all, to the general public. We believe it in line with the thrust of the legislation to permit—if not require—successor liability under traditional concepts.

*Smith Land,* 851 F.2d at 91–92; *see also Distler,* 741 F.Supp. at 641–42 (citing *Smith Land* with approval). The United States District Court for the District of Massachu-

setts has cited the *Smith Land* decision with approval. *See Acushnet River,* 712 F.Supp. at 1013–14.

The *Distler* court recognized that the *Smith Land* court appeared to suggest applying the successor liability doctrine under "traditional concepts" rather than some broader variation. *Distler,* 741 F.Supp. at 642 n. 6. Nevertheless, the *Distler* court emphasized that because the *Smith Land* court also mentioned that improper disposal may inure to the benefit of both the prior and successor corporations and their " 'respective shareholders' . . . the [*Smith Land* ] court did not view the traditional requirement of shareholder identity as absolute." *Distler,* 741 F.Supp. at 642 n. 4. In light of this language, the *Distler* court concluded that "the [*Smith Land* ] opinion taken as a whole supports the rationale of taking a *common sense rather than an overly restricted look at the corporate transfer." Distler,* 741 F.Supp. at 642 n. 4 (emphasis added).

■ The court's inquiry is in two parts. First, the court must consider whether the plaintiff has offered evidence of a genuine issue of material fact regarding whether a link exists between the plaintiff's site and one or more of the entities—Portland Waste Oil, George West and Conn–Val—to which the plaintiff claims the defendant succeeded. If the plaintiff cannot establish this link, the court need not consider whether the defendant succeeded to the liabilities of any or all of these entities. If the plaintiff succeeds in establishing the link, however, the court must consider whether the plaintiff has offered evidence of a genuine issue of material fact that the defendant is a successor to one or more of these entities.

There is no dispute that Conn–Val has ties to the plaintiff's tanks at the Lebanon, New Hampshire site. The defendant does not directly address the issue of whether a link exists between George West and the plaintiff's site. Instead, the defendant argues only that the plaintiff cannot prove the defendant's asset purchase from George West falls within an exception to the general non-liability rule. *See* Defendant's Memo at 11–13. However, the plaintiff has offered sufficient evidence at this stage of the proceedings to establish a link between George West and the plaintiff's site. The plaintiff offered evidence of a certificate of insurance which George West caused to be issued in favor of the plaintiff to cover the use of the tanks at the site. Plaintiff's Memo, Exhibit H. "If [George West] had no connection whatsoever with use of the Kleen tanks, it would have had no reason to procure insurance for Kleen's benefit." Plaintiff's Response Memo at 5. Finally, the court finds no evidence of a link between Portland Waste Oil and the plaintiff's site. As the defendant notes, the plaintiff has offered no such evidence. See Defendant's Memo at 10. In the absence of supporting evidence, this court cannot give weight to the plaintiff's mere assertion that Portland Waste Oil was linked to any of the contamination found at the site.

■ The next step in the court's inquiry is whether the plaintiff has offered sufficient evidence to establish the defendant's succession to the liabilities of either George West or Conn–Val. Turning first to Conn–Val, the defendant argues the plaintiff has been unable to establish a link between Conn–Val and the defendant. Defendant's Memo at 14. The defendant never purchased stock or assets from Conn–Val. Littlefield Affidavit at 3. The defendant alleges it never engaged in a single transaction with Conn–Val. *Id.* The plaintiff has offered no evidence to rebut the defendant's assertions. As such, the court will accept as uncontested the defendant's contentions. *See Liberty Lobby,* 477 U.S. at 257, 106 S.Ct. at 2514–15 (the nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment"); *Lawrence v. Northrop Corp.,* 980 F.2d 66, 68 (1st Cir.1992) (same). In light of the defendant's assertions, the court finds the defendant is not liable as a successor to Conn–Val.

The defendant rejects the plaintiff's argument that it is a legally liable successor corporation to George West as a result of the defendant's 1988 asset purchase from George West. Defendant's Memo at 11. The defendant urges the court to apply the traditional *de facto* merger exception to the facts of the instant case and find the defendant not liable as a successor corporation. In support of

this position, the defendant emphasizes there was no exchange of stock between the defendant corporation and George West nor is there an identity of stockholders between the two corporations. *See id.* at 12 (citing *Louisiana–Pacific,* 909 F.2d at 1264–65 (*de facto* merger can occur only when there is a "continuity of shareholders, accomplished by paying for the acquired corporation with shares of stock"); *Bud Antle, Inc. v. Eastern Foods, Inc.,* 758 F.2d 1451, 1458 (11th Cir.1985) (for a de facto merger "at the very least there must be some sort of continuity of the stockholders' ownership interests")); *see also* Littlefield Affidavit at 2–3. In addition, the defendant also urges the court to apply the traditional mere continuation exception to the facts of this case and find the defendant not liable as a successor corporation. In supporting this position, the defendant states the plaintiff cannot show that TWM is a mere continuation of the business of George West. Defendant's Memo at 13. There were no common shareholders. *Id.* Both corporations continued their separate corporate existences after the asset purchase. *Id.* George West retained some of its assets and all of its liabilities after the asset purchase. *Id.* The defendant did not use the George West name after the asset purchase. *Id.* No management personnel from George West became management personnel, officers or directors of TWM after the asset purchase. *Id.*

However, the court is of the opinion that it would not further the goals of CERCLA if the court applied either the traditional *de facto* merger exception or the mere continuation exception. "[S]trict adherence to the parochial requirements in CERCLA cases may in some instances conflict with the remedial policies underlying [CERCLA]." *Distler,* 741 F.Supp. at 642. Therefore, the court will adopt "a common sense rather than an overly restricted look at the corporate transfer." *See id.* at 642 n. 4.

The defendant would reject this approach as well, arguing that the asset purchase agreement provides only for the purchase of certain specified assets, with no express or implied assumption of liabilities. *See* Defendant's Memo, Exhibit I. Indeed, the defendant notes the agreement shows that George West expressly retained liabilities such as accounts payable. *Id.* at 11. Moreover, the defendant notes that the agreement requires George West to indemnify the defendant for any liabilities connected with the purchased assets. *Id.,* Exhibit I.

Nevertheless, the plaintiff contends that an examination of the contract between the defendant and George West establishes that the defendant purchased not just assets, but the entire business. Plaintiff's Memo at 10. "An examination of the contract between [George West] and TWM reveals that a consolidation and continuation of [George West's] business occurred." *Id.* The first paragraph of the agreement recites that "Seller agrees to sell and Buyer agrees to purchase from Seller the Seller's waste oil collection and sales business." *Id.,* Exhibit G, ¶ 1. The contract continues: "Seller shall deliver to the Buyer a Bill of Sale to vest in the Buyer free and clear title to the Seller's waste oil collection *and sales business.*" *Id.,* Exhibit G, ¶ 2 (emphasis added). The purchase price is identified not as a price for the assets but "for the Seller's waste oil collection *and sales business.*" *Id.,* Exhibit G, ¶ 4 (emphasis added). The parties agreed to "transfer of *management of the business* " by a certain date. *Id.,* Exhibit G, ¶ 2 (emphasis added).

The plaintiff argues the agreement contemplates cessation of George West's business and continuation of it by TWM. *See id.* at 11. In the agreement, the defendant purchased George West's collection and sales customer lists. *Id.,* Exhibit G, ¶ 4; *see also id.,* Exhibit J. The defendant also purchased the right to assume all of the seller's yellow page advertising contracts. *Id.,* Exhibit G, ¶ 4; *see also id.,* Exhibit J. The defendant also purchased George West's telephone numbers. *Id.,* Exhibit G, ¶ 4; *see also id.,* Exhibit J. "If [the agreement] did not contemplate the cessation of [George West's] business and continuation of it by TWM these purchases would have been unnecessary." *Id.* at 11.

The plaintiff notes that the agreement provides that the defendant would retain George West's owner, George West III, as a consultant and pay him a $60,000 annual consulting

fee. *Id.,* Exhibit G, ¶ 7. The plaintiff argues "[t]his insured [sic] to TWM both continuity and transfer of skill and experience in the acquisition of the business." *Id.* at 11. The agreement also prohibits George West from competing with the defendant in waste oil collection and sales business. *Id.,* Exhibit I. The court notes that the covenant not to compete places substantial temporal, regional and other restrictions on George West.

> The agreement prohibits not only the direct operation of a waste oil business, but also any advisory, consulting or promotional service or investment in any "process relating to the waste oil collection and sales business." Clearly, the parties intended, by the broad terms of this noncompete agreement, to cease the operation of [George West] on the date of the agreement and to continue its business through TWM.

*Id.* at 12. Finally, the plaintiff argues that in the agreement, the parties apportioned potential liabilities and provided for indemnity. *Id.,* Exhibit G, ¶ 11.

In view of this evidence, the court finds there is a genuine issue of material fact as to whether "in substance, if not in form," the defendant is liable as the successor corporation to George West. *See Mexico Feed,* 980 F.2d at 488. The court therefore denies the defendant's motion for summary judgment on the successor liability claim.

### (2) Defendant's Own Conduct

■ The plaintiff claims the defendant contributed to the site contamination through its negligence in removing the underground oil storage tanks. According to the plaintiff, the defendant is therefore liable under N.H.Rev.Stat.Ann. § 146–A:10 (1990 & Supp. 1991) and under state common-law principles of negligence and negligence per se. The

---

**2.** "[P]ersonal actions, except actions for slander or libel, may be brought only within 3 years of the act or omission complained of...." N.H.Rev.Stat.Ann. § 508:4 (Supp.1991).

**3.** The court notes the plaintiff earlier had alleged the statute of limitations did not begin to run until November 1, 1989, when it was conclusively established that the defendant's conduct was linked to the contamination at the site. *See*

plaintiff filed its complaint on October 17, 1991. The defendant contends that any cause of action arose in September 1987, when the defendant removed the tanks or, at the latest, on January 14, 1988, when the plaintiff first received notice from the state of potential contamination at the site. Accordingly, the defendant argues that the plaintiff's claims are barred by New Hampshire's three-year statute of limitations.[2]

The plaintiff counters that its claims are not time-barred because they are governed by the "discovery rule," which provides:

> when the injury and its causal relationship to the act or omission were not discovered and could not reasonably have been discovered at the time of the act or omission, the action shall be commenced within 3 years of the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of.

N.H.Rev.Stat.Ann. § 508:4 (Supp.1991); *see also Rowe v. John Deere,* 130 N.H. 18, 21, 533 A.2d 375, 376–77 (1987); *Raymond v. Eli Lilly & Co.,* 117 N.H. 164, 171, 371 A.2d 170, 174 (1977). The plaintiff argues the statute began to run on October 18, 1988, when WHN issued its Phase I site assessment report. "[T]he October 18, 1988, report was the first document Kleen received which established a causal link between the contamination and use of the tanks by Portland Oil Recycling or the removal of them by TWM." *See* Plaintiff's Response Memo at 4–5. Kleen brought its lawsuit on October 17, 1991, which was within three years from the date it received the report.[3]

"The point at which a cause of action accrues is a question for judicial determination." *University Sys. of New Hampshire v. United States Gypsum Co.,* 756 F.Supp. 640,

---

Plaintiff's Memo at 16. On November 1, 1989, WHN submitted its Phase II report to the plaintiff, which concluded that waste oil had been present at the site of the tank removal and that remediation was necessary. According to the plaintiff, "[t]his information led Kleen to conclude that it had a potential cause of action against TWM and/or Portland Oil Refining...." *Id.*

647 (D.N.H.1991) (citations omitted). In making this determination, the court is aware that "the discovery rule 'require[s] the interests of the opposing parties be identified, evaluated and weighed in arriving at a proper application of the statute.'" *Rowe*, 130 N.H. at 23, 533 A.2d at 377 (quoting *Shillady v. Elliot Community Hosp.*, 114 N.H. 321, 325, 320 A.2d 637, 639 (1974)). In this action, the defendant's interest is to put the plaintiff's claim to rest within a finite period of time. *See id.* By contrast, the plaintiff's interest is to be compensated for any injury attributable to the defendant's alleged negligence. *See id.* Accordingly, the defendant urges the court to find the cause of action accrued in January 1988, when the plaintiff learned of the contamination at the site. In focusing solely on the plaintiff's injury, however, the defendant appears to overlook that portion of the rule requiring the discovery of a causal relationship between the plaintiff's injury and the conduct of which the plaintiff complains before a cause of action accrues. *See* N.H.Rev.Stat.Ann. § 508:4; *see also Raymond*, 117 N.H. at 171, 371 A.2d at 174 (cause of action does not accrue until the plaintiff discovers "not only that he has been injured but also that his injury may have been caused by the defendant's conduct").

The court is of the opinion that the January 14, 1988 letter from the DES did not apprise the plaintiff of a possible link between the defendant's conduct and the site contamination. The possibility of a link is not suggested until the Phase I site assessment report was issued on October 18, 1988. At that point, the plaintiff's cause of action accrued. *See* N.H.Rev.Stat.Ann. § 508:4; *see also Raymond*, 117 N.H. at 171, 371 A.2d at 174. Because the plaintiff filed its suit on October 17, 1991, its claims against the defendant for the defendant's own alleged negligence are not barred by the statute of limitations.

### Conclusion

For the foregoing reasons, the court grants the defendant's motion to strike (document no. 12), but denies the defendant's motion for summary judgment (document no. 10).

SO ORDERED.