VILLAGE BUILDERS 96, L.P., a California Limited Partnership, Appellant, v. U.S. LABORATORIES, INC., a Delaware Corporation; and TESTING ENGINEERS OF NEVADA, INC., a Delaware Corporation, fka BUENA ENGINEERS, INC., Respondents.

No. 40950

VILLAGE BUILDERS 96, L.P., a California Limited Partnership, Appellant, v. U.S. LABORATORIES, INC., a Delaware Corporation; and TESTING ENGINEERS OF NEVADA, INC., a Delaware Corporation, fka BUENA ENGINEERS, INC., Respondents.

No. 41420

June 9, 2005                                          112 P.3d 1082

---

*Santoro, Driggs, Walch, Kearney, Johnson & Thompson* and *Kirby C. Gruchow Jr.* and *Gregory J. Walch,* Las Vegas, for Appellant.

*Lewis Brisbois Bisgaard & Smith, LLP,* and *Michael M. Edwards* and *Sheri M. Schwartz,* Las Vegas, for Respondents.

## OPINION

By the Court, ROSE, J.:

These cases involve the applicability of the general rule against finding a successor corporation liable for the acts of its predecessor and the exceptions to the rule and the appropriateness of an award of costs.

While this court has adopted the general rule that a successor is not liable for the acts of its predecessor and has recognized the rule's exceptions, we have yet to address the parameters of those exceptions under Nevada law. We now clarify the requirements that

a plaintiff must meet to have a successor corporation held liable under the de facto merger and mere continuation exceptions to the general rule. We decline to expand the mere continuation exception by adopting the continuity of the enterprise exception urged by appellant. We do conclude, however, that neither of the exceptions applies in the instant case; as a result, the district court ruled correctly on the issue of summary judgment, and we affirm the district court's order. Nevertheless, we conclude that the district court abused its discretion in awarding costs to respondent U.S. Laboratories, Inc. (U.S. Labs) in the absence of a verified memorandum of costs. Accordingly, we reverse the district court's order awarding costs to U.S. Labs.

## FACTS AND PROCEDURAL BACKGROUND

Ray Brannen formed Buena Nevada in September of 1995. Buena Nevada performed geotechnical engineering, environmental consulting work, construction inspection, and materials testing. At first, Brannen remained the sole shareholder of the corporation, but eventually he sold shares of the corporation to other investors. Brannen served as the chairman of the corporation's Board of Directors.

In December 1996, Brannen encountered financial difficulties and, as a result, sold Buena Nevada to Geofon, Inc., which purchased 100 percent of Buena Nevada's shares. The new company was named Buena Engineers, Inc., a Division of Geofon, Inc. (Buena Geofon). As part of the sales agreement, Brannen reserved the right to repurchase the shares of Buena Geofon. Importantly, Brannen never acted as a shareholder, officer, or director of Buena Geofon. Nevertheless, the Secretary of State's filings listed Brannen as president, secretary, and treasurer of Buena Geofon as of July 22, 1998. Brannen, however, testified in his deposition that after December 30, 1999, he did not perform any of those roles in Buena Geofon. Brannen admitted, however, that he acted as Buena Geofon's manager after the sale.

In his testimony, Brannen stated that Buena Geofon's chief executive officer, Alex Khan, made all of the major decisions concerning the company's activities and most of the minor ones as well. Brannen compared his position and authority in Buena Geofon to that of a Jack-In-The-Box manager but with less authority. Despite this representation by Brannen, Paul Davis, a Buena Geofon employee, testified that Brannen was authorized to enter into contracts on behalf of Buena Geofon. Geofon owned Buena Geofon until May 1999, when it sold the company back to Brannen, pursuant to his right of repurchase, so that Brannen could sell the company to respondent U.S. Labs.

In 1997, before Brannen purchased Buena Geofon and sold it to U.S. Labs, Buena Geofon submitted a proposal to appellant Village Builders, L.P. (Village) to perform an environmental site assessment (ESA) on property in Clark County, Nevada (the property). This property had an existing car wash and gas station facility on the premises. Village intended to purchase all rights in the property contingent upon a favorable ESA.

The proposal submitted by Buena Geofon was signed by Alex Khan as chief executive officer of Buena Geofon. The proposal was also signed by the chief executive officer of Geofon, Inc. Among other tasks, Buena Geofon proposed to drill three borings near the underground storage tanks (USTs) to gather samples and check for the presence of petroleum hydrocarbons. Village hired Buena Geofon to perform the tasks outlined in the proposal.

After completing the tasks, Buena Geofon submitted a report to Village documenting the results. The report stated that the ESA revealed only one recognized condition in connection with the property and no evidence of leaks or spills from the USTs. Additionally, the report stated that the USTs had recently passed tank tightness tests and therefore complied with applicable regulations. After receiving the report, Village purchased the property in September 1998 for approximately $2.8 million.

Village alleges that in December 1998 it discovered hydrocarbon contamination at the property and immediately notified the Nevada Division of Environmental Protection (NDEP) as required under Nevada law. NDEP acknowledged Village's notification and directed Village to clean up the contaminated soil and ground water at the property. Subsequently, Village alerted Buena Geofon about the discovery, and consequently, between March 3 and March 5, 1999, Buena Geofon drilled and constructed three monitoring wells to evaluate the extent of the property's contamination.

On April 30, 1999, less than three weeks before Brannen purchased Buena Geofon and sold it to U.S. Labs, Buena Geofon submitted a ''Detailed On-Site Characterization Report'' to NDEP that recommended installing a monitoring well, sampling ground water, monitoring water evaluations, and preparing a corrective action plan to clean up the property. After performing tests at the site, Buena Geofon submitted proposals on March 2, 1999, and March 23, 1999, to perform the clean-up work required by NDEP. NDEP approved the proposals, and Village hired Buena Geofon to clean up the property.

During the period when Village and Buena Geofon learned of the contamination on the property, Brannen began negotiating with U.S. Labs, which wished to purchase Buena Geofon. To achieve the sale, Brannen negotiated with Alex Khan to repurchase all of

Buena Geofon's outstanding shares. At the same time, Brannen negotiated an asset purchase agreement with Don Alford, U.S. Labs' executive vice president, which would result in the sale of all of Buena Geofon's assets to U.S. Labs, but which specifically excluded the sale of the company's stock. Dickerson Wright, the chief executive officer of U.S. Labs, also participated in the negotiations.

To conclude the deal, Brannen bought all of Buena Geofon's stock, thereby resuming ownership of the company known as Buena Nevada. Subsequently, Brannen sold all of Buena Nevada's assets and good will to U.S. Labs, excepting any stock. The asset purchase was completed on May 18, 1999, with an Asset Purchase Agreement (APA) between Buena Nevada, Brannen, U.S. Labs, and Buena Engineers, Inc., a Delaware Corporation (Buena Delaware), a company specifically formed to hold Buena Nevada's assets.

The APA identified the assets purchased by U.S. Labs as: personal property, personal property leases, phone numbers, certain contracts, computer software, trade rights, the Buena Engineers, Inc., name, customer lists, and good will. The APA also contained clauses assuming and limiting specific liabilities. After the sale, Buena Nevada continued to exist as a corporate entity until an ongoing lawsuit was settled; however, the company did not engage in any business activity.

The asset purchase was a cash transaction. While the APA provided that Brannen would receive 3,333 shares of U.S. Labs stock, Brannen never received that stock because he elected to receive $14,000, the cash value of the stock, instead. Brannen did, however, use this cash to purchase U.S. Labs stock.

In addition, after completing the agreement and transferring ownership, U.S. Labs hired many of Buena Geofon's employees to work for Buena Delaware, including Brannen. Buena Delaware also continued to utilize the same facilities and company logo after the sale and continued to offer geotechnical services and Phase I testing. Moreover, after the sale, Buena Delaware never altered the contracts it obtained under the APA, which included Buena Nevada's lease, its vendor and customer contracts, and the right to collect receivables, including those generated by the contract with Village for clean-up work on the property.

Meanwhile, in August 1999, Village filed an action seeking to recover its clean-up costs against the former property operators. In July 2002, after it discovered that U.S. Labs had purchased all of Buena Nevada's assets and good will in 1999, Village submitted an amended complaint and brought breach of contract, negligence, and negligence per se claims against U.S. Labs.

U.S. Labs moved to dismiss Village's claims and contended that the APA expressly stated which liabilities Village would assume. U.S. Labs argued that under the APA, it was not liable for Village's clean-up costs as Buena's successor and that, therefore, U.S. Labs and Buena Delaware were not proper parties to the litigation. In response, Village argued that U.S. Labs and Buena Delaware were proper parties to the suit based upon the doctrine of successor liability.

The district court treated U.S. Labs' motion to dismiss as a motion for summary judgment. The district court also ordered further discovery on the limited issue of successor liability, giving Village a period of sixty days to conduct discovery on the issue. The trial court granted U.S. Labs' motion for summary judgment, determining as a matter of law that U.S. Labs was not liable under a theory of successor liability.

U.S. Labs and Buena Delaware then filed a motion for attorney fees and costs. The district court awarded $3,108 in costs and denied the motion for attorney fees. Village also appealed from the order awarding costs.

## DISCUSSION

*Successor liability*

We review a district court's grant of summary judgment de novo.[1] A summary judgment motion is properly granted when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.[2] The district court must construe all of the "pleadings and evidence in the light most favorable to the nonmoving party."[3] Additionally, in order to overcome summary judgment on a successor liability claim, the plaintiff bears the initial burden of presenting evidence to establish that the general rule that a successor corporation is not liable for the acts of its predecessor does not apply.[4]

To determine whether a plaintiff has met this initial burden, courts should engage in fact-specific, case-by-case analysis of the factors necessary to establish an exception to the general rule precluding liability.[5] If the plaintiff fails to make a prima facie show-

---

[1]*Pressler v. City of Reno,* 118 Nev. 506, 509, 50 P.3d 1096, 1098 (2002).

[2]*Id.*

[3]*Id.* at 510, 50 P.3d at 1099.

[4]*Dayton v. Peck, Stow and Wilcox Co. (Pexto),* 739 F.2d 690, 692 (1st Cir. 1984); *see also Verhein v. South Bend Lathe, Inc.,* 448 F. Supp. 259, 260-61 (E.D. Wis. 1978), *aff'd,* 598 F.2d 1061 (7th Cir. 1979).

[5]*See Sweatland v. Park Corp.,* 587 N.Y.S.2d 54, 56 (App. Div. 1992).

ing of successor liability, summary judgment is appropriate.[6] However, if the plaintiff sets forth facts sufficient to establish a prima facie case of successor liability under one of the exceptions, the issue becomes one of fact, which must be determined by the jury.

As this court has previously noted in *Lamb v. Leroy Corp.*, ''it is the general rule that when one corporation sells all of its assets to another corporation the purchaser is not liable for the debts of the seller.''[7] In that case, we identified four ''well recognized exceptions'' to the general rule:

> (1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction is really a consolidation or a merger; (3) when the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transaction was fraudulently made in order to escape liability for such debts.[8]

Here, Village maintains that two of the exceptions apply—the de facto merger exception and the mere continuation exception. Village also urges this court to adopt an expanded version of the mere continuation exception known as the continuity of the enterprise exception, which we decline to do. However, because this court has yet to delineate the specific requirements necessary to demonstrate a claim under either the de facto merger exception or the mere continuation exception, we necessarily set forth those requirements now.

### De facto merger exception

The de facto merger exception permits courts to hold the purchaser of a business's assets liable for the seller corporation's conduct when the parties have essentially achieved the result of a merger although they do not meet the statutory requirements for a

---

[6]*See Ryan, Beck & Co., LLC. v. Fakih*, 268 F. Supp. 2d 210, 229 (E.D.N.Y. 2003); *Brandywine Realty Trust v. Blodnick, Blodnick & Zelin*, 772 N.Y.S.2d 602, 602-03 (App. Div. 2004); *see also Vancheri v. GNLV Corp.*, 105 Nev. 417, 420, 777 P.2d 366, 368 (1989) (''A prima facie case is defined as sufficiency of evidence in order to send the question to the jury. The question of sufficiency of the evidence does not turn on whether the trier of fact will make the desired finding.'' (citation omitted)); *cf. Gladstone v. Stuart Cinemas, Inc.*, 878 A.2d 214, 219 (Vt. 2005).

[7]85 Nev. 276, 279, 454 P.2d 24, 26-27 (1969) (citing *West Texas Refining & D. Co. v. Commissioner of Int. Rev.*, 68 F.2d 77 (10th Cir. 1933); *Ozan Lumber Co. v. Davis Sewing Mach. Co.*, 284 F. 161 (D. Del. 1922)).

[8]*Id.* at 279, 454 P.2d at 27 (citing *West Texas Refining & D. Co.*, 68 F.2d at 77).

de jure merger.[9] To determine whether there has been a de facto merger, courts apply a four-factor test and consider: (1) whether there is a continuation of the enterprise, (2) whether there is a continuity of shareholders, (3) whether the seller corporation ceased its ordinary business operations, and (4) whether the purchasing corporation assumed the seller's obligations.[10] We now adopt this test as the proper analysis to determine the existence of a de facto merger.

At the outset, we note that courts take varying approaches to weighing the four factors. For instance, some courts give great weight to the question of whether the consideration given by the seller consists of shares of the seller's own stock.[11] These courts emphasize this requirement because when two companies merge, the shareholders of the seller become shareholders of the buyer. As a result, these individuals share in the successor corporation's profits making it just to attach the seller's liabilities to the buyer to avoid any inequity that might result from allowing a shareholder to shed liability but retain profit.[12] However, when this factor is not present these courts have concluded that sound policy does not support imposing the predecessor's liabilities upon the successor " 'when it has already paid a substantial price for the assets of the predecessor.' "[13]

In contrast, other courts have determined that the factors should be weighed equally, and therefore no single factor is " 'either nec-

[9]*Kleen Laundry & Dry Cleaning v. Total Waste Mgt.*, 817 F. Supp. 225, 230 (D.N.H. 1993) [hereinafter *Kleen Laundry I*].

[10]*Keller v. Clark Equipment Co.*, 715 F.2d 1280, 1291 (8th Cir. 1983) (citing *Atlas Tool Co., Inc. v. C.I.R.*, 614 F.2d 860, 870-71 (3d Cir. 1980)); *Sylvester Bros. Dev. Co. v. Burlington Northern*, 772 F. Supp. 443, 447-48 (D. Minn. 1990); *Kleen Laundry I*, 817 F. Supp. at 230; *Ulanet v. D'Artagnan, Inc.*, 170 F. Supp. 2d 356, 358 (E.D.N.Y. 2001).

[11]*E.g., Louisiana-Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1264 (9th Cir. 1990), *overruled on other grounds by Atchison, Topeka & Santa Fe Ry. v. Brown & Bryant*, 132 F.3d 1295 (9th Cir. 1997); *Arnold Graphics Indus. v. Independent Agent Ctr.*, 775 F.2d 38, 42 (2d Cir. 1985); *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 439-40 (7th Cir. 1977); *Taylor v. Atlas Safety Equip. Co., Inc.*, 808 F. Supp. 1246, 1252 (E.D. Va. 1992); *Ray v. Alad Corp.*, 560 P.2d 3, 7 (Cal. 1977); *Manh Hung Nguyen v. Johnson Mach. & Press*, 433 N.E.2d 1104, 1106-07 (Ill. App. Ct. 1982) (noting that under corporate principles an absence of this factor would negate a finding of de facto merger); *Hamaker v. Kenwel-Jackson Mach., Inc.*, 387 N.W.2d 515, 519 (S.D. 1986); *Fox v. Sunmaster Products, Inc.*, 821 P.2d 502, 507 (Wash. Ct. App. 1991).

[12]*Nguyen*, 433 N.E.2d at 1110.

[13]*Kaleta v. Whittaker Corp.*, 583 N.E.2d 567, 571 (Ill. App. Ct. 1991) (quoting *Nguyen*, 433 N.E.2d at 1111).

essary or sufficient to establish a *de facto* merger.' ''[14] This approach is more reasonable because it properly balances the successor corporation's rights to be free from liabilities incurred by its predecessor, with the important interest involved in ensuring that ongoing businesses are not able to avoid liability by transferring their assets to another corporation that continues to operate profitably as virtually the same entity.[15] We conclude that this approach is consistent with the principles underlying the de facto merger exception, which ''is a judge-made rule that rests on general equitable principles.''[16] The New York appellate court in *Sweatland v. Park Corp.* noted that:

> Public policy considerations dictate that, at least in the context of tort liability, courts have flexibility in determining whether a transaction constitutes a de facto merger. While factors such as shareholder and management continuity will be evidence that a de facto merger has occurred (*see, Ladjevardian v. Laidlaw-Coggeshall, Inc.,* 431 F. Supp. 834), those factors alone should not be determinative.[17]

This rationale is persuasive, and therefore we will weigh equally all of the factors to determine if a plaintiff established a prima facie case for de facto merger.

*Continuity of the enterprise*

The first factor is whether there is a continuation of the enterprise. To determine whether there is a continuation of the enterprise, courts generally look to whether there is a '' 'continuity of management, personnel, physical location, assets and general business operations' '' between the purchaser and the seller.[18] Here, the facts demonstrate that this factor is met.

First and foremost, Buena Delaware hired Brannen, who founded Buena Nevada and served as a manager with Buena Geofon, to be a manager in the newly formed corporation. Addition-

---

[14]*Kleen Laundry I,* 817 F. Supp. at 230-31 (quoting *In re Acushnet River & New Bedford Harbor,* 712 F. Supp. 1010, 1015 (D. Mass. 1989)); *see also Klumpp v. Bandit Industries, Inc.,* 113 F. Supp. 2d 567, 572 (W.D.N.Y. 2000); *Cargill v. Beaver Coal & Oil Co.,* 676 N.E.2d 815, 818 (Mass. 1997); *Turner v. Bituminous Cas. Co.,* 244 N.W.2d 873, 880 (Mich. 1976); *Harashe v. Flintkote Co.,* 848 S.W.2d 506, 509 (Mo. Ct. App. 1993).

[15]*See Sweatland,* 587 N.Y.S.2d at 56 (discussing the policy considerations that led to development of de facto merger exception).

[16]*In re Acushnet River,* 712 F. Supp. at 1015.

[17]587 N.Y.S.2d at 56.

[18]*Kleen Laundry I,* 817 F. Supp. at 230 (quoting *In re Acushnet River,* 712 F. Supp. at 1015).

ally, U.S. Labs hired most of the employees of Buena Geofon to work for Buena Delaware after the completion of the sale. These employees included: Paul Davis, second in charge of the office; Tasha Harris, the billings and collections manager; and Carol Sweet, manager of environmental projects. Notably, these persons retained similar positions to those that they held with Buena Nevada.

In fact, retention of these individuals comports with U.S. Labs' stated policy goals in acquiring companies. On its website, U.S. Labs stated specifically that when deciding whether to purchase a company's assets, "a primary consideration is the quality of management and the necessity that key personnel remain on board." U.S. Labs also stated, "[I]f we acquire a stand alone operation, that company must have a management team thoroughly committed to going forward with us." We conclude that these facts are sufficient to demonstrate continuity in management and personnel.

Furthermore, Buena Delaware continued to do business at the same physical location utilized by Buena Nevada and to use Buena Nevada's letterhead three weeks after the completion of the sale. Importantly, Buena Delaware failed to change the logos on the company's trucks, windows, and doors until February 2000. In addition, the company continued to operate in much the same manner, offering the same services to many of the same clients, until it purchased Stewart Environmental in January 2000 and added Phase II and Phase III environmental services. Considering these facts, we conclude that Village has sufficiently demonstrated this factor under the test that we adopt today.

### Continuity of shareholders

The second factor is whether there is a continuity of shareholders. Village argues that there is a continuity of shareholders. We disagree.

A review of the purchase agreement reveals that Brannen would receive 3,333 shares of U.S. Labs stock as consideration for Buena Nevada's assets, in addition to the monetary consideration of $300,000. The parties failed to complete the transaction as set forth in the agreement; instead, Brannen received $14,000 cash in lieu of stock and then proceeded to use that cash to purchase 3,333 shares of U.S. Labs stock on the open market.

We conclude that this transfer of stock is not sufficient to demonstrate continuity between the shareholders of Buena Nevada and those of U.S. Labs for two reasons. First, we note that the amount of stock transferred was not substantial. Second, and most importantly, we note that Brannen did not purchase and has never owned any Buena Delaware stock. Consequently, we conclude that there is no continuity of shareholders in this case.

### Cessation of ordinary business operation

The third factor is whether the seller corporation continued to exist after the sale of assets.[19] Some courts have determined that when a seller of assets continues to exist after the sale of assets to the successor corporation, there is no de facto merger.[20] U.S. Labs urges this court to adopt this view. We refuse to do so; rather, we view this as a factor to be equally weighed to determine whether a de facto merger occurred in a given case.

Here, the evidence demonstrates that this factor was not met in the instant case because Buena Nevada continued to exist after the asset purchase. After the asset purchase, Brannen changed the name of the seller corporation and maintained it as a corporate entity pending resolution of an outstanding lawsuit. In *Tucker v. Paxson Machine Co.,* the Eighth Circuit determined that a similar set of facts precluded a finding of de facto merger.[21] In fact, at least two courts have concluded that there was no de facto merger when the seller corporation continued to exist but did not engage in any business operations.[22] In *Schumacher v. Richards Shear Co.,* the court rejected an assertion of successor liability when the predecessor continued to exist ''as a distinct, albeit meager, entity.''[23] In *Gavette v. The Warner & Swasey Co.,* the court concluded that de facto merger did not lie because the seller corporation continued to exist ''at least transcendentally for one year.''[24]

Likewise, in the instant case, the seller, Buena Nevada, continued to exist after it sold all of its assets to U.S. Labs. Therefore, it was amenable to suit during that period of time. As a result, we conclude that the facts simply do not support Village's contention that this factor is met.

### Assumption of those obligations necessary for normal business operations

The final factor is whether the purchasing corporation assumed the seller's obligations. Village contends that under the APA's pro-

---

[19]*Ulanet,* 170 F. Supp. 2d at 358; *Kleen Laundry I,* 817 F. Supp. at 230; *Sylvester Bros. Dev. Co.,* 772 F. Supp. at 447-48.

[20]*E.g., Tucker v. Paxson Machine Co.,* 645 F.2d 620, 622 n.6 (8th Cir. 1981) (affirming district court's conclusion that a de facto merger did not exist because the predecessor continued to exist after the sale); *Schumacher v. Richards Shear Co., Inc.,* 451 N.E.2d 195, 198 (N.Y. 1983); *Gavette v. The Warner & Swasey Co.,* No. 90-CV-217 GLS, 1999 WL 118438, at *5 (N.D.N.Y. March 5, 1999).

[21]645 F.2d at 622.

[22]*Schumacher,* 451 N.E.2d at 198; *Gavette,* 1999 WL 118438, at *5.

[23]451 N.E.2d at 198.

[24]1999 WL 118438, at *5.

visions, U.S. Labs assumed the obligations necessary for the newly formed Buena Delaware to carry out Buena Nevada's normal business operations. The record supports that contention. Moreover, U.S. Labs' own corporate policy suggests that the assumption of those obligations was part and parcel of its national acquisition strategy. On its website, U.S. Labs stated that its national acquisition strategy was to ''permit a newly acquired company to continue as before without changing the name, personnel or operational policies.'' Notably, the APA's terms reflect this policy.

Those terms aptly demonstrate that after the sale, Buena Delaware acquired all those rights and obligations necessary to operate the business. The obligations assumed included Buena Nevada's lease, its vendor and customer contracts, and the right to collect receivables, including those generated by Village during the clean-up work on the property. U.S. Labs also acquired Buena Nevada's phone numbers, computer software, sales and promotional literature, and trade rights under the APA. Additionally, U.S. Labs assumed liability in specifically delineated contracts, the personal property leases, and all licensing agreements relating to trade rights. However, under the APA, U.S. Labs expressly stated that it would not assume liability for litigation matters instituted after the closing of the sale but arising out of actions that occurred before the sale. Nevertheless, we conclude that the facts in this case demonstrate a prima facie case that U.S. Labs assumed the obligations necessary to continue the normal business operations of Buena Nevada after the sale.

As previously noted, we will weigh all four of the factors of de facto merger equally to determine whether the exception should be applied in any given case. In this case, we conclude that prima facie evidence showed continuity of the enterprise and that U.S. Labs assumed those obligations necessary to continue the normal operations of the business. However, we also conclude that there was no continuity of shareholders and that Buena Nevada continued to exist after the sale of its assets, making it amenable to suit for some time after the sale. Under these facts, we conclude that Village has failed to demonstrate the existence of a de facto merger. The record shows that Brannen had no personal relationships with anyone at U.S. Labs before the APA negotiations. Additionally, U.S. Labs provided adequate consideration for the assets, negating any argument that the sale was a sham intended to shelter Buena Nevada from liability while allowing it to operate profitably in its new form. Therefore, we conclude that a de facto merger does not exist when only two of the four factors exist, and we affirm the district court's decision to grant summary judgment in favor of U.S. Labs on this issue.

*Mere continuation exception*

*The test for mere continuation*

Historically, a plaintiff must meet the following two require-
ments to justify bringing a sale of assets within the purview of the
mere continuation exception to the general rule: (1) only one cor-
poration remains after the transfer of assets; and (2) there is an
identity of stock, stockholders, and directors between the two
corporations.[25] Village urges this court to adopt a more expansive
interpretation of the mere continuation exception known as the
"continuity of the enterprise" doctrine. The more expansive inter-
pretation that Village advocates uses eight factors to determine if
the exception is met. Those factors include:

> (1) retention of the same employees;
> (2) retention of the same supervisory personnel;
> (3) retention of the same production facilities in the same
> location;
> (4) production of the same product;
> (5) retention of the same name;
> (6) continuity of the assets;
> (7) continuity of general business operations; and
> (8) whether the successor holds itself out as the continuation
> of the previous enterprise.[26]

We decline to adopt this more expansive test in cases similar to
the one at bar. Importantly, we note that most of the courts address-
ing this issue have limited the application of the doctrine to cases
involving claims of products liability and Comprehensive Environ-
mental Response, Compensation, and Liability Act (CERCLA) vi-
olations.[27] Indeed, the New Hampshire Supreme Court declined to
adopt the expanded doctrine in a contract or tort context, stating
that it "is grounded upon public policies that are not applicable to
traditional commercial and contract law, which are governed by pre-
dictability of results and the intentions of the parties."[28]
Courts have adopted the expanded doctrine in the limited cir-
cumstance of products liability because they recognized that sound

[25]*U.S. v. Carolina Transformer Co.*, 978 F.2d 832, 838 (4th Cir. 1992).

[26]*Kleen Laundry & Dry Clng. v. Total Waste Management*, 867 F. Supp.
1136, 1140 (D.N.H. 1994) (quoting *Kleen Laundry I*, 817 F. Supp. at 231)
(citations omitted) [hereinafter *Kleen Laundry II*].

[27]*E.g., id.* (CERCLA claim); *Kleen Laundry I*, 817 F. Supp. 225 (CERCLA
claim); *Savage Arms, Inc. v. Western Auto Supply Co*, 18 P.3d 49, 55-56
(Alaska 2001) (products liability); *Alad*, 560 P.2d 3 (products liability).

[28]*Bielagus v. EMRE of New Hampshire Corp.*, 826 A.2d 559, 569 (N.H.
2003).

public policy favors the protection of the public against dangerous products.[29] Likewise, courts have opined that a more expansive rule is justified in CERCLA cases in order to protect the taxpayer from the expenses incurred in remedying the pollution.[30] We will leave the consideration of this exception in CERCLA and products liability claims for another day.

The instant case involves a claim of general negligence. Village did not assert a CERCLA claim against U.S. Labs or Buena Delaware. Therefore, public policy does not justify the application of such an exception in the instant case.

More importantly, we are persuaded by the fact that "[t]he trend in other jurisdictions appears to be away from the expansion of successor liability" and "in favor of retaining the traditional rule on non-liability."[31] As a result, we elect to follow the general rule and require that the two traditional factors must be met to assert a claim of successor liability under the mere continuation exception.

*Application of the mere continuation exception*

One federal district court has opined that "[t]he gravamen of the 'mere continuation' exception is the continuation of corporate control and ownership, rather than continuation of business operations."[32] Many courts have likewise concluded that the key inquiry in resolving this issue is whether there exists a continuation of the corporate entity.[33] We agree. For that reason, it is impossible in the instant case to conclude that Village has asserted a prima facie case for the mere continuation exception.

Importantly, Village cannot establish that only one corporation existed after the sale. As discussed above, both Buena Nevada and Buena Geofon continued to exist after the sale of assets to U.S. Labs. In addition, Village has failed to demonstrate that there exists an identity of stock, stockholders or directors between Buena Nevada on the one hand and U.S. Labs and Buena Delaware on the other. Brannen purchased only a negligible amount of U.S. Labs stock, which we have already concluded is insufficient to demon-

---

[29]*Roll v. Tracor, Inc.*, 140 F. Supp. 2d 1073, 1083 (D. Nev. 2001); *Alad*, 560 P.2d at 9.

[30]*Carolina Transformer*, 978 F.2d at 840.

[31]*MBII v. PSI*, 89 Cal. Rptr. 2d 778, 781 (Ct. App. 1999) (internal quotation marks omitted).

[32]*East Prairie R-2 School Dist. v. U.S. Gypsum Co.*, 813 F. Supp. 1396, 1400 (E.D. Mo. 1993) (citing *Tucker*, 645 F.2d at 625-26).

[33]*E.g., Tucker*, 645 F.2d at 625-26; *Parson v. Roper Whitney, Inc.*, 586 F. Supp. 1447, 1450 (W.D. Wis. 1984); *Weaver v. Nash Intern., Inc.*, 562 F. Supp. 860, 863 (S.D. Iowa 1983).

strate prima facie evidence of continuity of stock. Additionally, Brannen was made president of Buena Delaware, but did not serve as an officer or director of U.S. Labs, the purchasing corporation. Therefore, we conclude that the facts in this case are insufficient to establish a common or substantially similar ownership between the selling and purchasing corporation.

As a result, Village has failed to show that either requirement for establishing the mere continuation exception has been met. Accordingly, we conclude that the district court properly granted U.S. Labs' motion for summary judgment because no exception to the general rule of successor nonliability will lie under this particular set of facts.

### The district court's award of costs

Village also contends that the district court erred in awarding U.S. Labs costs because U.S. Labs failed to file a verified memorandum of costs. Instead, U.S. Labs filed a motion for attorney fees and costs, which Village argues is insufficient to satisfy the requirements of NRS 18.110(1). We agree.

A district court's decision regarding an award of costs will not be overturned absent a finding that the district court abused its discretion.[34] NRS 18.020(3) states that costs must be allowed to the prevailing party against any adverse party against whom judgment is rendered in "an action for the recovery of money or damages, where the plaintiff seeks to recover more than $2,500." Under NRS 18.110(1), a prevailing party must submit:

> a memorandum of the items of his costs in the action or proceeding, which memorandum must be verified by the oath of the party, or his attorney or agent, or by the clerk of his attorney, stating that to the best of his knowledge and belief the items are correct, and that the costs have been necessarily incurred in the action or proceeding.

In addition, NRS 18.110(1) dictates that this verified memorandum must be filed within five days after the entry of judgment unless the court grants extra time. This court has determined, however, that the five-day period is not jurisdictional and the district court has discretion to reach the merits of an untimely motion for costs and expert witness fees.[35] Costs must "be interpreted to mean

[34]*U.S. Design & Constr. v. I.B.E.W. Local 357,* 118 Nev. 458, 462, 50 P.3d 170, 172 (2002); *Parodi v. Budetti,* 115 Nev. 236, 240, 984 P.2d 172, 174 (1999).

[35]*Eberle v. State ex rel. Redfield Trust,* 108 Nev. 587, 590, 836 P.2d 67, 69 (1992).

actual costs that are also reasonable, rather than a reasonable estimate or calculation of such costs based upon administrative convenience."[36]

U.S. Labs contends that because the motion was actually filed early, in between the time when the district court granted summary judgment and when it entered the judgment, it meets the requirements of NRS 18.110. Furthermore, U.S. Labs contends that the costs requested in the instant case do not require additional documentation to justify their reasonableness. U.S. Labs does not deny that it did not provide documentation as to the requested costs, nor does U.S. Labs deny that it failed to verify the motion. Instead, U.S. Labs contends that because its counsel signed the motion under NRCP 11, which certified that the pleading was well grounded in fact, verification was not required, and in any event, there are no cases overturning an award for failure to provide verification. We disagree.

In *Gibellini v. Klindt,*[37] this court addressed a situation, similar to the one in the instant case, where the district court awarded costs for photocopying, telephoning, and postage expenses. In that case, the prevailing party based its estimate of costs on the law firm's customary practice of charging four percent of the client's total billable charges for such expenses.[38] The court determined that the district court abused its discretion because there was no indication that the costs involved were actually incurred by the prevailing party.[39] Likewise, in *Bobby Berosini, Ltd. v. PETA,* this court determined that the district court abused its discretion because it granted an award of costs based upon the prevailing party's submission of itemized materials that did not show how the costs "were necessary to and incurred in the present action."[40]

This case is factually analogous to the aforementioned cases. Here, U.S. Labs contends that submission of an itemization is sufficient because "the costs claimed here do not require additional documentation to justify their reasonableness." U.S. Labs argues further that "[t]hose moving for costs should not be required to provide justifying documentation for each copy made or each call placed to substantiate the reason for the copy or call when the overall amount is obviously reasonable." This argument is unpersuasive because such documentation is precisely what is required

---

[36]*Gibellini v. Klindt,* 110 Nev. 1201, 1206, 885 P.2d 540, 543 (1994).

[37]110 Nev. 1201, 885 P.2d 540.

[38]*Id.* at 1205, 885 P.2d at 543.

[39]*Id.* at 1205-06, 885 P.2d at 543.

[40]114 Nev. 1348, 1352, 871 P.2d 383, 386 (1998).

under Nevada law to ensure that the costs awarded are only those costs actually incurred. Once such documentation is provided, it is then up to the district court to determine if the amount spent is reasonable. Accordingly, the district court improperly awarded costs.

## CONCLUSION

We now adopt the traditional rule to determine whether the exception of de facto merger exists. We conclude that the factors considered should be weighed equally. In addition, we decline to adopt an expansive rule for determining whether the mere continuation exception applies. Instead, we adopt the traditional rule used by courts to determine if the "mere continuation" exception applies. Here, we conclude that Village failed to demonstrate a prima facie case for either of these two exceptions. Accordingly, we affirm the district court order granting summary judgment in favor of U.S. Labs.

We do conclude, however, that the district court abused its discretion by awarding costs to U.S. Labs in the absence of a verified memorandum of costs showing that U.S. Labs' costs were actually incurred. Accordingly, we reverse the district court order awarding costs to U.S. Labs.

BECKER, C. J., MAUPIN, GIBBONS, DOUGLAS, HARDESTY and PARRAGUIRRE, JJ., concur.